**INA AVIATION CORPORATION and Ina Marx, as the Executrix of the Estate of Eric Marx, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

No. 75–C–1086.

United States District Court, E. D. New York.

April 1, 1979.

Haight, Gardner, Poor & Havens, New York City, for plaintiffs; Robert B. Haserot, New York City, of counsel.

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., Federal Aviation Administration, Litigation Div., Washington, D. C., by Andrew J. Dilk, Jr., Washington, D. C., for defendant; Cyril Hyman, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

BARTELS, District Judge.

This is a motion pursuant to Fed.R.Civ.P. Rule 56 for summary judgment by defendant United States in an action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), for personal injuries and property damage resulting from an airplane crash. The thrust of plaintiffs' complaint is that, applying either general negligence principles or the Missouri Humanitarian Doctrine, the crash was caused by the acts and omissions of defendant's employees. In considering the motion, the court thought it necessary to hear oral testimony to supplement the documentary materials submitted as permitted by Fed.R.Civ.P. Rule 43(e). Certain facts are undisputed but the inferences and legal conclusions to be drawn therefrom are not.

## FACTS

Plaintiff Eric Marx [1] was the Chairman of the Board, President and owner of plaintiff INA Aviation Corporation (INA), the registered owner of a twin engine Piper PA–31 Navajo aircraft bearing registration number N510BB. He was also the holder of an instrument pilot certificate issued pursuant to Instrument Flight Rules (IFR) which permitted him to fly a properly equipped aircraft in weather conditions not suitable for flight under Visual Flight Rules (VFR) and N510BB was equipped with the necessary instrumentation. On September 20, 1974, Marx was the pilot and sole occupant of the aircraft N510BB and in attempting to land his plane crashed approximately seven miles from the Joplin, Missouri airport. Since the crash occurred in inclement weather and plaintiffs charge defendant with negligence in failing to promptly notify Marx of changes in the weather conditions, a chronological account of the events preceding the crash is necessary.

At approximately 11:30 P.M. (0530 Greenwich Mean Time (GMT)) on September 19, 1974, Marx telephonically filed with the Federal Aviation Administration (FAA) Flight Service Station (FSS) [2] in Albuquerque, New Mexico an IFR flight plan [3] advising of his proposed flight from Albuquerque to St. Louis, Missouri. Although advised by the FSS specialist there of potential thunderstorm activity along his proposed route, Marx departed Albuquerque for St. Louis shortly after midnight (0601 GMT) on September 20.

At 4:09 A.M. Central Daylight Savings Time (1009 GMT) on September 20, 1974, after numerous deviations from his planned route of flight in order to avoid thunderstorms, Marx asked the controller at the Kansas City Air Route Traffic Control Center [4] how far he was from St. Louis. The controller, Gerald D. Hultgren, responded that Marx was 10 miles from Pittsburg, Kansas and 210 miles from St. Louis. Marx informed the controller that he had only an hour and a quarter or an hour and a half of fuel remaining and that he wanted to refuel at the closest airport on route. Marx asked how far he was from Kansas City and was told 80 miles. He then asked where he could obtain fuel within 50 to 80 miles. Controller Hultgren suggested Springfield, Missouri which was 60 miles away and asked Marx how much fuel he had.

At 4:11 A.M. (1011 GMT), Marx repeated that he had an hour and 15 minutes of fuel remaining. Hultgren told Marx that there were no thunderstorms between his position and St. Louis and that he estimated that Marx could be in St. Louis in an hour and a half. Marx said it was "too close;" he could not take a chance on flying to St. Louis. Hultgren then asked Marx where he wanted to go. Marx said he wanted something on route, that is, not too far out of his way.

---

1. Upon Marx's subsequent, unrelated death, Ina Marx was substituted as Executrix of the Estate of Eric Marx.

2. A Flight Service Station (FSS) is a pilot information service, supplying weather information to pilots and receiving information constituting a flight plan from pilots of instrument flights. It has no radar and knows an aircraft's location only by asking the pilot or control center. An FSS is staffed by a specialist whose duties include making weather observations (not weather forecasts), providing pilots with pre-flight weather information, and assisting airborne aircraft with updated weather information.

3. The information filed by a pilot in his flight plan includes the proposed true airspeed, cruising altitude, route of flight, estimated time on route, and amount of fuel on board and is conveyed in advance to air traffic facilities whose jurisdictions are traversed by the proposed route of flight.

4. The Air Route Traffic Control Center is a radar facility, not located at an airport, which is responsible for providing separation between aircraft in order to prevent collisions. At an airport, the tower typically provides air traffic services. However, a center provides these services to airports where there is no tower or when the tower is inoperative. The Kansas City Center is located in Olathe, Kansas and provides air traffic services for Joplin, Missouri at night when the tower is inoperative. It provided these services for Joplin at the time of the crash.

At 4:13 A.M. (1013 GMT), controller Hultgren suggested Joplin, Missouri and told Marx it was 10 miles south. Marx said, "Okay vector me to Joplin Missouri." Hultgren instructed Marx to tune in on his instrument, the Automatic Direction Finder (ADF), for the outer marker [5] and gave him the proper heading. Rather than look it up on the charts which he was required to have in his possession, Marx asked the controller for, and was given, the Instrument Landing System (ILS) frequency for the localizer.[6]

At 4:14 A.M. (1014 GMT), after Marx elected to go to Joplin, Hultgren called Joplin FSS to inform the specialist that Marx would land there and to ask for the present weather. The specialist, Richard L. Steinkemp, gave Hultgren the regular, hourly weather observation [7] which had been taken and recorded by him 15 minutes earlier at 3:59 A.M. (0959 GMT). The recorded weather—ceiling 400 feet overcast (totally covered by clouds), 4 miles visibility and very light rain and fog—was above the minimum safe approach conditions specified by the FAA for ILS Runway 13 at Joplin.

At 4:15 A.M. (1015 GMT), Hultgren told Marx the weather at Joplin and asked him if he had the approach plate,[8] cleared him to land at Joplin ILS Runway 13, and gave him the frequency of Joplin FSS. Marx

missed his first approach to Joplin airport either because he failed to execute it properly or, as he testified at his deposition,[9] because the weather conditions were poor. Specialist Steinkemp informed Hultgren of the missed approach and sought and received clearance for Marx to attempt to land again at 4:33 A.M. (1033 GMT).

At 4:35 A.M. (1035 GMT), Hultgren called Springfield and learned that the weather there was "300 broken 4000 overcast and 1 mile and fog," presenting worse instrument conditions than at Joplin. Hultgren then asked specialist Steinkemp whether conditions at Joplin had changed. Steinkemp answered that, as far as he knew, there was no change but, noting some deterioration, he would check.

At 4:40 A.M. (1040 GMT), Hultgren completed a special weather observation,[10] recorded it and informed Marx of the changed weather—ceiling 200 obscured, 3 miles visibility, drizzle and fog—which, with respect to ceiling, was below the minimum safe approach conditions specified for Joplin.[11] This was the last contact with Marx.

At 4:49 A.M. (1049 GMT), neither controller Hultgren nor specialist Steinkemp could get Marx on the radio and the controller

---

5. The outer marker, part of the Instrument Landing System (ILS), is a vertical radio beam which, when received and displayed by the Automatic Direction Finder (ADF), functions as a navigational aid.

6. The localizer, also part of the ILS and a navigational aid, is a radio beam which assists the pilot in centering the aircraft onto the runway.

7. Hourly weather observations are made by the FSS specialist. In addition, a special weather observation is required when the ceiling or visibility falls below levels prescribed by the National Weather Service. At Joplin, each time the ceiling falls below 1000, 600, 500, 400, or 300 feet or the visibility falls below 3, 2, 1 and 1/2, or 3/4 miles, the FSS specialist is required to take a special weather observation.

8. An approach plate is a chart depicting an airport runway and its approach and landing procedures. Pilots are required to carry and be able to read approach plates.

9. Marx testified that he executed the approach on auto-pilot to the decision height of 250 feet (the height at Joplin at which the decision must be made to either continue the approach or execute a missed approach), saw nothing and therefore pulled up and executed a missed approach.

10. See note 7 supra.

11. Although it is below the minimum safe approach conditions of ceiling 300 feet and visibility 3/4 mile and therefore considered dangerous at Joplin, pilots frequently land despite a ceiling of 200 feet. When conditions are less than the minimum, the controller gives the pilot the information and asks the pilot's intention. If the pilot wants clearance, the controller will clear the approach. As Hultgren testified, the pilot is entitled to a "look see," particularly in light of the fact that weather observation is not an exact science and pilots sometimes find that reports of below minimum conditions at an airport are inaccurate.

could not "paint" him on radar. At his deposition, Marx testified that he attempted a second approach, again flew to the decision height and saw nothing. Believing it was his only alternative, Marx testified that he decided to attempt an off airport landing on a highway. In doing so, the wing of N510BB struck a bridge abutment and the aircraft landed in a field and burst into flames. Marx suffered injuries and the aircraft was totally destroyed.

## DISCUSSION

■ Defendant claims in this motion for summary judgment that it was not negligent in weather reporting but, on the contrary, plaintiff Marx was negligent in underestimating the distance from Albuquerque to St. Louis and the time and fuel required for such a flight and in striking a bridge while landing in foggy weather. Defendant asserts that, under Missouri law,[12] plaintiffs' recovery is barred by Marx's contributory negligence. Plaintiffs claim that defendant was negligent in issuing an untimely and inaccurate weather report which caused the accident and, moreover, that the defendant was liable for the same alleged acts and omissions under the Missouri Humanitarian Doctrine even if Marx was contributorily negligent.

■ At the outset, plaintiffs contend that summary judgment is *per se* inappropriate in a negligence action. We disagree. As a general proposition, negligence questions are properly resolved at trial because, upon a motion for summary judgment, a court may not try issues of fact; it may only determine whether there are factual issues to be tried. *E. g., S. E. C. v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978); *Heyman v. Commerce and Industry Co.*, 524 F.2d 1317 (2d Cir. 1975).

However, courts have granted summary judgment in negligence actions. 6 Moore's Federal Practice ¶ 56.17[42] (2d ed. 1976) and cases cited therein; 10 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2729 (1973) and cases cited therein. *E. g., Brown v. Gamm*, 525 F.2d 60 (8th Cir. 1975); *Bland v. Norfolk & Southern Railroad Co.*, 406 F.2d 863 (4th Cir. 1969); *Williams v. Baltimore & Ohio Railroad Co.*, 303 F.2d 323 (6th Cir. 1962). "[T]he question whether summary judgment is appropriate in any case is one to be decided upon the particular facts of that case." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 259, 88 S.Ct. 1575, 1577, 20 L.Ed.2d 569 (1968). "A summary judgment motion in favor of defendant should be granted in those cases in which there is no genuine issue as to any fact that is crucial to plaintiff's cause of action so that as a matter of law he cannot recover." 10 Wright & Miller, *Federal Practice and Procedure, supra*, § 2729 at 561.

### Defendant's Negligence

The inferences to be drawn from the facts heretofore admitted do not justify the conclusions that the weather report given Marx by controller Hultgren and specialist Steinkemp at 4:15 A.M. was inaccurate, that defendant was negligent, or that defendant's acts caused the accident. Hultgren testified that when, at 4:15 A.M. he requested the present weather from the specialist at Joplin, he did not specifically request that a new weather observation be taken. Steinkemp testified that he gave Hultgren the regular, hourly weather reading, that he did not then take a new weather observation, and that such a new weather observation would have taken five minutes to complete.[13] He further testified

---

12. The parties do not dispute that, applying New York choice of law principles, Missouri law applies to questions of liability in this case. Notably, Missouri was the site of Marx's destination, the crash of N510BB, and the Joplin FSS specialist with whose performance in particular plaintiffs find fault. *See Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963).

13. Steinkemp testified that making a weather observation entails reading instruments within the FSS and going outside to gather information. For example, within the FSS, the specialist records the temperature, dew point, air pressure (from the altimeter), wind direction and velocity, visibility (Runway Visual Value (RVV)), and cloud height (from the ceilometer).

that there was no indication that the weather had changed during the fifteen minute period since the last observation was made at 3:59 A.M. Although Steinkemp did not specifically recall reading the various weather instruments or going outside between 3:59 and 4:15 A.M., he did testify that it was his practice to keep an eye on these things while performing his other duties as a specialist, that he complied with the rules and regulations governing the taking of special weather observations [14] and that, until he took the special observation between 4:35 and 4:40 A.M., there was no indication of a drop in the ceiling that would require the taking of a special weather observation.[15] He testified that he provided Marx with the updated weather information as soon as he determined that there was a drop in the ceiling.

Plaintiffs claim, however, that an inference that the weather deteriorated to below landing minimums before 4:15 A.M. must be drawn from the government's destruction of certain records, known as "traces," produced at Joplin FSS by two weather instruments, the ceilometer and the Runway Visual Value (RVV). One may infer from the intentional destruction of evidence that its production would have been unfavorable to an intentional spoliator. *Dow Chemical Co. (U. K.) v. S. S. Giovanella D'Amico*, 297 F.Supp. 699, 701 (S.D.N.Y.1969). An inference that relevant evidence would be unfavorable is also justifiable where it is within the control of a party in whose interest it would naturally be to produce it and he fails to do so, without satisfactory explanation, and instead produces weaker evidence or no evidence. *Mid-Continent Petroleum Corp. v. Keen*, 157 F.2d 310, 315 (8th Cir. 1946). But one cannot justify the drawing of such an inference where the destruction of evidence is unintentional or where failure to produce evidence is satisfactorily explained.

Steinkemp testified in particular with respect to the ceilometer trace that the normal procedure was to place the rolled-up paper on which several days' or a week's record appears into a storage bin for perhaps 15 or 30 days. After that time, the trace is discarded. He did not know what became of the traces from September 20, 1974. Counsel for the government confirmed that an FAA manual requires the orderly destruction of records, some within 20 or 60 days. Defendant contends that all papers potentially relevant to an accident cannot be saved, that FAA employees who are not lawyers cannot be expected to anticipate plaintiffs' counsel's legal theories, that plaintiffs' requests for records were ambiguous at best and failed to put FAA personnel on notice at the time that the traces should be retained, and, finally, that, where weather reports were recorded in a log included among the documents preserved for plaintiffs' case, destruction of the traces is satisfactorily explained. As a matter of law, we are inclined to agree with defendant that plaintiffs' requests for the retention of pertinent documents did not provide notice that the traces should be retained. We conclude that there is no showing that the government's destruction of the traces was intentional.

Plaintiffs seek to prove too much from the absence of the traces. Given the limitations of the ceilometer and RVV, those documents would not be conclusive. The RVV measures visibility on the instrument runway at Joplin. The measuring device, located at the threshold of the runway, relays information to the FSS where it is displayed in two ways—as a trace and on a dial (from zero to 1 and ½ miles). Steinkemp testified that the RVV must be supplemented by the specialist's observation of known visibility markers outside the FSS and that, in any event, during the period in question, the RVV never went below 1 and ½ miles. The ceilometer measures the

And outside, the specialist observes the types of clouds (from which he can estimate cloud height), extent of cloud coverage and known visibility markers (e. g., a water tower known to be two miles away).

14. *See* note 7 *supra.*

15. *See* note 7 *supra.*

height of the clouds. Its measuring device, located to the east and approximately 4000 feet from the threshold of the Joplin instrument runway, relays information to the FSS where it is continuously recorded and displayed as a trace. Steinkemp testified that in reading the trace, which takes 30 seconds, the specialist compares a mark on the paper with a mark on the machine to determine cloud height. The ceilometer measures cloud height at only one location and for only a very small area of the sky. Thus, its accuracy depends on the cloud it hits or, in other words, the representative nature, in terms of their height, of the clouds passing over that one location. For the same reason, cloud height as measured by the ceilometer fluctuates rapidly. The specialist is required, however, to measure the prevailing cloud height. The ceilometer must therefore be supplemented by outside observation in order to guarantee its accuracy as well as determine the amount and extent of cloud coverage. Steinkemp's testimony is not necessarily "weaker evidence" than the ceilometer and RVV traces. Thus, the absence of the traces does not justify drawing the inferences that the weather had deteriorated by 4:15 and that the government is liable.

### Humanitarian Doctrine

In addition to the claim of negligence, plaintiff invokes the Missouri Humanitarian Doctrine to nullify the bar to recovery resulting from Marx's alleged contributory negligence. *Hobbs v. Renick*, 304 F.2d 856 (8th Cir. 1962); *Fix Fuel and Material Co. v. Wabash R. Co.*, 243 F.2d 110 (8th Cir. 1957). That doctrine, which is analogous to the "last clear chance" doctrine, is applicable when the following five elements are demonstrated: (1) plaintiff's position of imminent peril; (2) defendant's actual or constructive notice of that peril; (3) defendant's present ability, with the means at hand, to avert the impending injury without injury to himself or others; (4) defendant's failure to exercise the required

degree of care; and (5) a resulting injury to the plaintiff. *Brown v. Gamm*, 525 F.2d at 62; *Hobbs v. Renick*, 304 F.2d at 862; *Rudloff v. Johnson*, 267 F.2d 708 (8th Cir. 1959); *Allen v. United States*, 370 F.Supp. 992 (D.Mo.1973).

To bring themselves within the Humanitarian Doctrine, plaintiffs assert that (1) Marx was running low of fuel and thus in a position of imminent peril, (2) air traffic controller Hultgren was advised that Marx was low on fuel and thus defendant had notice of Marx's peril, (3) defendant was in a position to avert the impending injury because it had available national weather services and airport facilities information from which it could ascertain at which airport Marx could land, (4) defendant failed to exercise the required degree of care by failing to use the services and information available to it and instead by giving Marx 15 minute old, inaccurate weather information, and (5) relying upon the inaccurate and stale weather information, Marx tried to land at Joplin but was forced to attempt an emergency off airport landing which resulted in his injuries and the aircraft's destruction.

Defendant points out that there is no proof that Marx was in imminent peril at 4:15 A.M. and denies that its employees had the ability to avert the injury by directing Marx to a different airport. Thus, controller Hultgren testified that although, at 4:13 A.M. when he suggested Joplin, he was not specifically aware of its weather conditions, he was aware of the hourly weather readings there. In addition, he had been working that sector for four hours and during that time, Joplin was the only airport reporting normal operating procedures. Hultgren had cleared aircraft into and out of Joplin within 30 minutes or an hour of his contact with Marx. Unlike Joplin, the airports at Springfield, Wichita, and Tulsa had reported missed approaches.[16] Hultgren testified that, in suggesting Joplin, he

16. Had Marx desired to go to Springfield, controller Hultgren testified that, because of the prior missed approaches, he would have advised him to wait while he checked the weather there.

had suggested the closest airport which also seemed to have the best weather conditions. Hultgren further testified that he did not believe there was an emergency at 4:13 A.M.; with the quantity of fuel remaining, Marx could execute several approaches at Joplin or go to two or three airports. It was not until 4:33 A.M., after Marx had missed his first approach to Joplin and thus had expended some fuel, that Hultgren felt the situation was an emergency. At that time, he contacted the one other airport then within the range of the aircraft—Springfield—and learned that the weather conditions there were worse than at Joplin, thus eliminating Springfield, despite its proximity, as a possible alternative destination for Marx.

Here we do not find that there are any factual issues to be tried. Regardless of the theory of liability, plaintiffs must in the first instance establish defendant's negligence and this depends upon the time the weather at Joplin deteriorated. Plaintiffs contend that *if* the weather deteriorated before 4:15 A.M. and Steinkemp observed it but failed to warn Marx, or *if* it deteriorated after 4:15 A.M. but in time for Steinkemp to warn Marx so that he could break off his attempt to land at Joplin while he still had sufficient fuel to go elsewhere, the government was negligent. However, as heretofore recited, no such evidence was adduced and all of plaintiffs' claims are unsupported hypotheticals.

As a result of the court's holding that the inference requested by plaintiffs is unreasonable, the only direct evidence addressed to the question of weather deterioration is the testimony of specialist Steinkemp, which supports the government's position that the weather deteriorated well after 4:15 A.M. and thus that the report given Marx at that time was accurate. Under Fed.R.Civ.P. Rule 56(e), to survive a summary judgment motion, plaintiffs must

present some evidence and cannot rely on the unsubstantiated assertion that there is a dispute. *S. E. C. v. Research Automation Corp.*, 585 F.2d at 34; *Donnelly v. Guion*, 467 F.2d 290 (2d Cir. 1972). *See Schwartz v. United States*, 38 F.R.D. 164, 166 (D.N.D. 1965). Plaintiffs have not done so. Nor is there any indication that they would be able to present such evidence at trial. In fact, it appears that a trial would, on the question of liability, merely duplicate in this same forum the evidence presented on this motion. In the absence of any evidence that the weather deteriorated prior to or shortly after 4:15 A.M., no reasonable person could conclude that the United States was negligent.[17] There is therefore no issue of fact requiring trial and defendant is entitled to judgment as a matter of law. Under the circumstances, summary judgment is appropriately granted to terminate this litigation quickly and fairly. *See S. E. C. v. Research Automation Corp.*, 585 F.2d at 32.

SO ORDERED.

---

17. Demeanor evidence might satisfy a tribunal that a witness' testimony is untrue and that the truth is the opposite of his story. "Nevertheless, although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him." *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952).