**HESTER INDUSTRIES, INC., Plaintiff,**

v.

**TYSON FOODS, INC., Defendant.**

**No. 93–CV–391.**

United States District Court,
N.D. New York.

July 29, 1997.

For Decision on Motion to Amend, see 985 F.Supp. 83.

Nixon & Vanderhye, P.C. (Robert W. Adams, Duane M. Byers, Robert A. Rowan, J. Scott Davidson, of counsel), Arlington, VA, Kohn, Bookstein & Karp, P.C. (Richard A. Kohn, of counsel), Albany, NY, for plaintiff.

Husch & Eppenberger (Karen J. Halbrook, Joseph H. Knittig, of counsel), Kansas City, MO, Levene, Gouldin & Thompson (David M. Gouldin, of counsel), Binghamton, NY, Shughart, Thomson & Kilroy, P.C. (John R. Cleary, of counsel), Kansas City, MO, for defendant.

McAVOY, Chief Judge.

In August 1989, The plaintiff, HESTER INDUSTRIES, INC. (hereinafter "Hester"), filed a Complaint against the defendant, TYSON FOODS, INC. (hereinafter "Tyson"), alleging that Tyson's use of the mark WING FLINGS constituted trademark dilution and infringement. Shortly before trial, the parties entered into a Settlement Agreement that was incorporated into a Dismissal Order, filed on April 9, 1992. The Settlement Agreement provided, *inter alia*, that "Tyson agrees to stop all uses of the WING FLINGS mark in association with poultry products." *See* Settlement Agreement ¶ 1.

It is now alleged that Tyson did not comply with the Settlement Agreement, and that Hester has been damaged as a result. Hester subsequently brought an action for Tyson's alleged failure to comply with the Dismissal Order/breach of the Settlement Agreement.' Following extensive and contentious discovery, this matter was tried before the undersigned in a non-jury trial commencing January 14, 1997.

## I. FINDINGS OF FACT

### A. Parties

The plaintiff, Hester Industries, Inc., is a "further processor" of poultry products with annual sales for the year 1996 in excess of $48 million. Approximately forty-percent of Hester's sales are generated from the sale of chicken wings products, the so-called "WING DINGS" family of products. The sale of "WING DINGS" accounts for approximately fifty-percent of Hester's profits. These products are sold primarily to food distributors. Hester's target consumer is the U.S. population as a whole. Most of the "WING DINGS" products ultimately reach consumers through institutional, restaurant, retail, wholesale club store, or food service outlets.

The defendant Tyson Foods, Inc., is a competitor of Hester in relation to the chicken wings products, and is the largest poultry processor in the world, with annual sales approximating $8 billion. Approximately $120 million dollars of sales from about September 1992 to January 1, 1996 were generated annually from the sale of chicken wing products, the so-called IQF or "Instant Quick Freeze" product, first sold under the mark WING FLINGS and then WING FLINGERS. This product is sold through sales representatives and brokers primarily to retail and wholesale club stores.

The Hester "WING DINGS" product is a pre-cooked, pre-seasoned frozen chicken wing product.

The Tyson IQF product, at one time called WING FLINGS, and then, WING FLINGERS, is a raw, uncooked, unseasoned frozen chicken wing product.

Hester holds a valid, federally licensed U.S. trademark in the WING DINGS mark.

Moreover, pursuant to a Settlement Agreement effective March 12, 1992, and incorporated into this Court's April 9, 1992 Order of Dismissal, relating to the previous [1] action involving these parties, Tyson agreed to stop "all uses of the WING FLINGS mark in association with poultry products" by certain dates. More specifically, Tyson agreed to exhaust its inventory of product number 141, the 5 lb. bag of WING FLINGS, by September 1, 1992. All other inventory bearing the WING FLINGS mark was to be exhausted by December 1, 1992. Tyson was permitted to extend those dates for no more than two months upon prior notice to Hester. Tyson also agreed that from the date of the Settlement Agreement, it would not have any new packaging or other materials produced bearing the WING FLINGS mark. Hester paid Tyson $150,000.00 and agreed not to contest the use of the mark WING FLINGERS.

Hester has vigorously defended the "WING DINGS" mark in the past through the use of negotiated settlements and litigation.

After the deadlines set forth in the Settlement Agreement had passed, Hester learned of an advertisement in the March 10, 1993, Washington Post for the sale of Tyson WING FLINGS.

Hester's attorneys sent a letter to Tyson, dated March 17, 1993, complaining of the continued sale of product marked with the infringing mark, and demanded an accounting of all uses of WING FLINGS after September 1, 1992. By letter dated March 19, 1993, Tyson's attorneys declined to comply with Hester's demand, and stated that Tyson had "better things to do with its time."

Hester commenced the present action, by the filing of a Summons and Complaint, on March 25, 1993. The Complaint, subsequently amended, alleges breach of contract, violation of the stipulated Order of Dismissal, trademark dilution, trademark infringement, and unfair competition. After a bench trial, and after a full review of the record in this case, the Court has determined that the sole claim to be decided by this Court is whether or not, and to what extent, Tyson violated the stipulated Order of Dismissal by continued use of the WING FLINGS mark after the deadline set forth therein.

The food service and retail sales markets for poultry products are blurred and/or overlap.

Hester has made no claim for lost sales or lost profits, However, Hester seeks Tyson's profits relating to the sales of alleged offending chicken wing products made by Tyson after the deadlines set forth in the Settlement Agreement.

### B. Wrongful Acts of Tyson

Tyson became aware that it was using invoices with the WING FLINGS mark in July 1993. Upon learning of the noncompliant use of the mark, Tyson did not investigate for other such uses and did not issue a statement to its employees, agents, and/or customers to cease the use of the WING FLINGS mark.

Tyson became aware that it was packaging product in packages bearing the WING FLINGS mark in mid-December 1992. Following that discovery, Tyson did not notify Hester of the noncompliance. Tyson did not investigate for additional noncompliant packaging, and did not issue a statement to its employees, agents, and/or customers to cease use of the WING FLINGS mark.

Tyson was aware, after the deadline in the Settlement Agreement, that wholesale clubs and retail stores, to which it sold IQF products and for whom Tyson paid at least some advertising costs, were, at least episodically, advertising the sale of Tyson WING FLINGS.

Tyson sales representatives and/or brokers made on site visits to a number of stores and wholesale clubs, after the deadline set forth in the Settlement Agreement, to inspect the display of IQF products and "signage." The sales representatives and brokers reported no violations of the Settlement Agreement.

Tyson was aware that IQF product was shipped to club stores in packaging bearing

1. *Hester v. Tyson,* 89–CV–0949.

the WING FLINGS mark after the deadline date of the Settlement Agreement.

Tyson's knowledge of noncompliant use of the WING FLINGS mark is illustrated by the following examples testified to at trial:

The Kroger Company bought Tyson IQF products from at least March 12, 1992 through October 12, 1994. Price lists provided to Kroger prior to October 1, 1994 used the WING FLINGS mark. "Receiver" documents, indicating the receipt of IQF product, and provided to Kroger, used the WING FLINGS mark. The WING FLINGS mark was used in Kroger advertising during, at least, the dates March 29, 1993 through April 4, 1993, and December 28, 1992 through January 3, 1993.

Tyson sales representatives and/or brokers check with the Kroger stores to ensure that Tyson products are ordered and displayed properly. At no time was Kroger instructed by Tyson to stop using the WING FLINGS mark.

At no time was Kroger confused as to the source of the chicken wing products it purchased. There is no evidence of actual consumer confusion relating to the chicken wings products sold at Kroger.

Meijer, Inc. received price lists and invoices from Tyson covering the dates January 1993 through March 1993, using the WING FLINGS mark. In addition, Meijer, Inc. used "ad slicks" provided by Tyson for advertisements on April 4, 1993, and from May 23, 1993 through May 23, 1993 through May 29, 1993, using the WING FLINGS mark.

Meijer, Inc. had no knowledge of the Settlement Agreement executed by the parties, and Tyson, as of October 14, 1994, had not instructed Meijer, Inc. to cease use of the WING FLINGS mark.

At no time was Meijer, Inc. confused as to the origin of the chicken wing products it purchased for resale.

Prior to April 1993, Sam's Club stores sold IQF product in WING FLINGS packaging, and displayed signage using the WING FLINGS mark. Sam's was not instructed by Tyson to cease use of the WING FLINGS mark, prior to October 4, 1994. Sometime thereafter, Tyson in-structed Sam's to cease use of the WING FLINGS mark.

After the deadline date set forth in the Settlement Agreement, BJ's Wholesale Club sold Tyson IQF product in packaging using the mark. During at least the month of November 1994, Tyson shipped 6 lbs. packages of IQF product to BJ's. This product was identified on the BJ's Daily Vendor Sheets as "Tyson 6 lb. Wing Flings." Sometime thereafter, Tyson instructed BJ's to cease use of the WING FLINGS mark.

The Order Guide provided to members of the Associated Grocers company, dated October 7, 1994 through October 13, 1994 uses the term "Tyson Wing Flings." Advertisements for Associated Grocers during the years 1992 and 1993 used the term "Tyson Wing Flings." The Associated Grocers' invoices sent to member grocery stores listed a product called "Tyson Wing Flings." As of October 12, 1994, Tyson had not instructed Associated Grocers not to use the WING FLINGS mark.

In October or November of 1994, Tyson learned that IQF product from its Blountsville facility was being shipped to non-Tyson warehouses and/or shippers with the WING FLINGS mark on the packaging. Tyson attempted to relabel to noncompliant product. Tyson did not commence an investigation of any other facility for noncompliant product.

Subsequent to March 13,1993, and continuing until at least January 1994, Tyson continued to order and use inventory forms containing the term WING FLINGS. An inventory form is an internal Tyson document that is not shown to any ultimate consumer.

Tyson designates the products it sells by the use of product code numbers. The following product codes and descriptions relate to IQF products at issue in this case.

| | |
|---|---|
| 141 | IQF product provided to retail customers |
| 142 | IQF product provided to retail and/or international customers |
| 146 | IQF product sold to Sam's Clubs |
| 147 | IQF product sold to Sam's Clubs |
| 7563 | IQF product sold to Price/Costco |

9612   IQF product sold to Price/Costco
9611   IQF product sold to BJ's
8346   IQF product sold to Price/Costco
4542   IQF product sold to Price/Costco

Tyson used the mark "WING FLINGS" after the deadline date on case end labels, packaging, invoices, bills of lading, film, and in promotional materials.

Tyson packaging for the product bearing the product code number 9611–928 from the date December 6, 1992 through March 6, 1993 bore the mark WING FLINGS. The net sales dollars for that time period is $277,002.00, for sales of 336,720 pounds of IQF product.

Tyson packaging for the product code 7563–916 from the date December 6, 1992 through March 6, 1993 bore the mark WING FLINGS. The net sales dollars for that time period is $516,231.00, for sales of 716,928 pounds of IQF product.

Tyson packaging for the product code 9612–939 from the date December 6, 1992 through March 6, 1993 bore the mark WING FLINGS. The net sales dollars for that time period is $398,859.00, for sales of 489,888 pounds of IQF product.

Tyson packaging for the product code 146–928 from the date December 6, 1992 through March 6, 1993 bore the mark WING FLINGS. The net sales dollars for that time period is $912,630.00, for sales of 1,161,400 pounds of IQF product.

Tyson packaging is seen by Tyson customers and/or ultimate consumers of its IQF product.

Tyson labels for the product bearing the product code 9612–939 from the date month ending September 3, 1994, through October 29, 1994 bore the mark WING FLINGS. The total net sales dollars for this period was $498,518.00, for sales of 625,344 pounds of IQF product.

Tyson labels for the product bearing the product code 7563–916 from the date month ending September 3, 1994, through October 29, 1994 bore the mark WING FLINGS. The total net sales dollars for this period was $502,093.00, for sales of 666,816 pounds of IQF product.

Tyson bills of lading for the Tyson product code 141–928 used the WING FLINGS mark at least during the time frame month ending October 3, 1992 through September 4, 1993, the month ending October 2, 1993, and January 28, 1995 through March 4, 1995. The total sales dollars for the time period October 3, 1992 through September 4, 1993 equals $18,654,235.00, for sales of 29,025,080 pounds of IQF product. The amount for the remaining time periods equals $194,558.00, for sales of approximately 186,971 pounds of IQF product.

Tyson bills of lading for the Tyson product code 142–928 used the WING FLINGS mark at least during the time frame December 6, 1992 through October 2, 1993. The net sales dollars for the time period amounted to $88,676.00, for sales of 106,080 pounds of IQF product.

Tyson bills of lading for the Tyson product code 146–928 used the WING FLINGS mark at least during the time frame December 6, 1992 through March 7, 1993. The total net sales dollars for the time period was $912,630.00, for sales of 1,161,400 pounds of IQF product.

Tyson bills of lading for the Tyson product code 147–928 used the WING FLINGS mark at least during the time frame month ending March 6, 1993 through October 10, 1993. The total net sales dollars for that period was $2,660,953.00, for sales of 3,242,200 pounds of IQF product.

Tyson bills of lading are an internal document not seen by a Tyson customer or ultimate consumer.

Tyson sales orders for the Tyson product code 141–928 used the WING FLINGS mark at least during the time frame October 3, 1992 through September 4, 1993. The total sales dollars for the time period October 3, 1992 through September 4, 1993 equals $18,654,235.00, for sales of 29,025,080 pounds of IQF product.

Tyson sales orders for the Tyson product code 142–928 used the WING FLINGS mark at least during the time frame December 6, 1992 through October 2, 1993. The net sales dollars for the time period amounted to $88,-

676.00, for sales of 106,080 pounds of IQF product.

Tyson sales orders for the Tyson product code 146–928 used the WING FLINGS mark at least during the time frame December 6, 1992 through March 7, 1993. The total net sales dollars for the time period was $912,630.00, for sales of 1,161,400 pounds of IQF product.

Tyson sales orders for the Tyson product code 147–928 used the WING FLINGS mark at least during the time frame month ending March 6, 1993 through October 10, 1993. The total net sales dollars for that period was $2,660,953.00, for sales of 3,242,200 pounds of IQF product.

Tyson sales orders are an internal Tyson document not seen by a Tyson customer or ultimate consumer.

Tyson invoices for the Tyson product code 141–928 used the WING FLINGS mark at least during the time frame October 3, 1992 through September 4, 1993. The total sales dollars for the time period October 3, 1992 through September 4, 1993 equals $18,654,235.00, for sales of 29,025,080 pounds of IQF product.

Tyson invoices for the Tyson product code 142–928 used the WING FLINGS mark at least during the time frame December 6, 1992 through October 2, 1993. The net sales dollars for the time period amounted to $88,676.00, for sales of 106,080 pounds of IQF product.

Tyson invoices for the Tyson product code 146–928 used the WING FLINGS mark at least during the time frame December 6, 1992 through March 7, 1993. The total net sales dollars for the time period was $912,630.00, for sales of 1,161,400 pounds of IQF product.

Tyson invoices for the Tyson product code 147–928 used the WING FLINGS mark at least during the time frame month ending March 6, 1993 through October 10, 1993. The total net sales dollars for that period was $2,660,953.00, for sales of 3,242,200 pounds of IQF product.

Tyson invoices are an internal Tyson document not seen by a Tyson customer or ultimate consumer.

Tyson generates a bill of lading, order and invoice for each transaction, and/or movement of goods. Accordingly, the net sales dollar amounts set forth for the Court are duplicative for each such document with the exception of bills of lading for the times periods month ending October 2, 1993, and January 28, 1995 through March 4, 1995 for the Tyson product bearing the product code 141–928.

Tyson retail price lists, provided to food brokers and Tyson retail sales employees, for the product code 141–928 used the term WING FLINGS during the time period July 26, 1992 through August 29, 1992. Some of these price lists were provided to Tyson customers. The total net sales dollars for the time period amount to $1,817,795, for sales of 2,699,280 pounds of IQF product.

Tyson club store price lists for the retail price lists, provided to food brokers and Tyson retail sales employees, for the product code 9612–939 used the term WING FLINGS during the time period December 6, 1992 through October 29, 1994. The total net sales dollars for this time period was $3,145,642.00, for sales of 3,908,544 pounds of IQF product.

Tyson club store price lists for the retail price lists, provided to food brokers and Tyson retail sales employees, for the product code 7563–916 used the term WING FLINGS during the time period December 6, 1992 through October 29, 1993. The total net sales dollars for this time period was $3,578,985.00, for sales of 4,989,792 pounds of IQF product.

The Total net sales dollars for all periods of Tyson violations, adjusted for duplication, amounts to $30,831,958.00, for sales of 45,656,067 pounds of IQF product.

## C. Tyson Procedures

Tyson uses the "Take Out Value" approach to arrive at a figure for "Cost of Goods Sold." The Take Out Value is figure usually below the expected sales price for the IQF chicken wing product several months in the future, as

determined with reference to the Urner–Barry Report and Tyson certain executive's "feel" for the future market. The Take Out Value usually is recalculated no more frequently than quarterly. The Take Out Value is unrelated to the historical actual cost of producing the IQF product. Accordingly, although the Take Out Value is acceptable for use in relation to internal accounting, it is inappropriate for use when determining profits.

Tyson contracts with its outside shippers, such as Zero Mountain, Inc., for shipment/delivery of its goods, and lists the shipper as an agent of Tyson. Tyson retains the risk of loss. Tyson retains title of the product. Tyson directs the shipper where, when, and to whom IQF product is to be shipped.

Tyson contracts with its food brokers, such as Morris Alper & Sons, to sell IQF products, and lists the broker as an agent of Tyson. Tyson sets the prices for the product. Tyson provides the description of the product. Tyson provides promotional materials, such as ad slicks, to the broker. On occasion, Tyson will reimburse the broker for advertising costs incurred through a retailer, or will permit the broker to draw from a Tyson account. Tyson is solely responsible for shipping and billing relating to sales of the IQF product.

## II. CONCLUSIONS OF LAW

### A. Civil Contempt

"Under 18 U.S.C. § 401(3), a district court has the power to fine a person for disobeying the court's order. The 'sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance.'" *Weitzman v. Stein*, 891 F.Supp. 927, 930 (S.D.N.Y.1995), *modified on other grounds*, 98 F.3d 717 (2d Cir.1996), *quoting*, *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979); *Cancer Research Inst., Inc. v. Cancer Research Society, Inc.*, 744 F.Supp. 526, 529 (S.D.N.Y.1990). It has long been held that the purpose of civil contempt is not punitive. *Sunbeam Corp. v. Golden Rule Appliance Co.*, 252 F.2d 467, 469 (2d Cir.1958). Thus, sanctions should be calculated to coerce future compliance with the Court's orders and to compensate the injured party for losses resulting from the contemptuous conduct. *Id.*

A finding that a party should be held in civil contempt requires a showing of clear and convincing evidence. *See Manhattan Industries, Inc. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1, 4 (2d Cir.1989); *New York State Nat'l Org. For Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989); *Upjohn Co. v. Medtron Laboratories, Inc.*, 894 F.Supp. 126, 133 (S.D.N.Y.1995). "Pursuant to the 'clear and convincing' evidence standard, a court's inherent power to hold a party in civil contempt should be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the party has not diligently attempted in a reasonable manner to comply." *Upjohn*, 894 F.Supp. at 133 (citations omitted). The third prong may be met by a showing of a "failure 'to energetically police compliance'" with the Court's Order. *Manhattan Indus.*, 885 F.2d at 5, *citing* 1 J. Gilson, Trademark Protection and Practice § 8.07[5], at 8–169 (1988).

In the instant case, a Dismissal Order, incorporating the terms of a Settlement Agreement signed by the parties, was filed with the Court on April 9, 1992. The Settlement Agreement was effective from March 12, 1992, and provided that Tyson would "stop all uses of the WING FLINGS mark in association with poultry products." *See* Settlement Agreement ¶ 1. The plaintiff has established clearly and convincingly that Tyson did not stop all uses of the WING FLINGS mark. The deadlines could have been extended for a specified period of time if Tyson had requested such. However, Tyson made no request for an extension.

During the time periods set forth in the Fact section above, Tyson used the WING FLINGS mark on its invoices, sales orders, bills of lading, advertising materials, pricing documents, and/or packaging materials. These uses occurred after the deadlines for no further uses of the mark had passed. Thus, it is clear that Tyson failed to comply

with the clear and unambiguous language of the Dismissal Order.

As to whether Tyson energetically policed compliance with the Dismissal Order, the Court concludes that it did not. First, there was testimony at the trial that the matter of compliance with the Dismissal Order could have been effectuated in a single day. Tyson merely had to change its central computer program so that the mark would no longer be automatically printed on documents. In addition, Tyson could have sent notification to its various divisions, distributors, brokers, managers, and other relevant employees and agents, advising that the use of the WING FLINGS mark must cease by an agreed upon deadline. This was not done in a manner reasonably calculated to achieve that result. In addition, there is evidence that Tyson continued to pay for a number of advertisements using the WING FLINGS mark from the effective date of the Settlement Agreement until early 1996. Moreover, after receiving notification from Hester's counsel that Tyson was not complying with the Settlement Agreement, Tyson responded to the request that it investigate by stating in a March 19, 1993, letter that it had "better things to do with its time." For these reasons, *inter alia*, the Court concludes that Tyson failed to exert reasonably diligent and energetic efforts to accomplish what was ordered in the Dismissal Order. *See Manhattan Indus.*, 885 F.2d at 7.

Based on the foregoing, the Court concludes that Tyson violated the Dismissal Order, and should be held in civil contempt of this Court's Dismissal Order. The Court next turns to the issue of an appropriate sanction.

## B. Sanctions for Civil Contempt

■ Having concluded that the defendant Tyson violated the Dismissal Order and should be held in contempt, the Court must now determine the appropriate sanction to be imposed. As clearly stated in *Manhattan Industries*, "a civil contempt sanction may ... serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompli-

ance." *New York State NOW v. Terry*, 886 F.2d 1339, 1352 (2d Cir.1989) (citation omitted). In the instant case, the plaintiff seeks compensatory sanctions. The Court notes that in fashioning the appropriate remedy, it must keep in mind that the goal of civil contempt proceedings is "remedial and compensatory, [ ] not punitive." *Sunbeam Corp. v. Golden Rule Appliance Co.*, 252 F.2d 467, 469 (2d Cir.1958) (further citation omitted).

■ As further stated in *Manhattan Industries*, when a monetary sanction is imposed for past noncompliance with a Court Order, such sanction "is not always dependent on a demonstration of 'actual pecuniary loss.'" *See* 885 F.2d at 5, *quoting, Leman v. Krentler–Arnold Hinge Last Co.*, 284 U.S. 448, 455–56, 52 S.Ct. 238, 241–42, 76 L.Ed. 389 (1932). Although the Second Circuit in *Terry* stated that "compensatory sanctions should reimburse the injured party for its actual damages," 886 F.2d at 1352, the Supreme Court in *Leman*, which reasoning was expressly adopted by the Second Circuit in *Manhattan Industries*, held that an award of profits is an appropriate civil contempt sanction even when the plaintiff has not shown legal damages. *See* 284 U.S. at 456, 52 S.Ct. at 241–42. However, lest a plaintiff be awarded a windfall, the *Sunbeam* Court has limited such recoveries in this Circuit by setting forth a general rule that a plaintiff may recover "the profits derived by the defendant's wrongful conduct: [not] assets not related to its wrongful conduct." *Sunbeam*, 252 F.2d at 470. Thus, in the absence of showing actual harm to itself, the Court concludes that Hester may recover those profits that Tyson arguably derived from the wrongful use of the WING FLINGS mark. *See Manhattan Indus.*, 885 F.2d 1, 6 (under a theory of unjust enrichment, a plaintiff in a contempt action is entitled to the contemnor's profits without submitting direct proof of injury, much less proof that any injury to the plaintiff "approximated in amount the defendant's profits") (citation omitted).

The plaintiff has set forth a number of categories of materials on which the WING FLINGS mark wrongfully appeared. The Court will now consider each, and whether

any support a monetary damage award against Tyson.

## C. Monetary Sanction

### 1. Bills of lading, sales orders, and invoices

■ Turning to the evidence at trial, the Court notes that bills of lading, sales orders (Tyson and broker), and invoices are Tyson internal documents that are never seen by a distributor or ultimate consumer. Therefore, any net sales dollars associated with these documents and the use of the WING FLINGS mark must be excluded from any sanction calculation, as any sales and corresponding profits relating to those documents are not related to the wrongful conduct, i.e., the use of the offending mark. *See Sunbeam*, 252 F.2d at 470. The reason is quite simple. If the documents are internal, although their use of the offending mark is a technical violation of the Dismissal Order, such use played no discernable role in the generation of profits by Tyson. No distributor could have made a decision based on those documents, and no customer could have made a purchase decision based on those documents.

In *Manhattan Industries*, the plaintiff was awarded the profits generated by actual sales of sweaters bearing the offending mark, despite the fact that no actual damage, e.g., actual customer confusion as to origin, was proved. *See* 885 F.2d at 6–7. Because the sanction in *Manhattan Industries* is an award of profits, the focus is "on the defendant's wrongdoing, not on damage to the plaintiff." *Id.* at 6. However, the result of that wrongdoing arguably must injure the plaintiff. Such injury need not be economic and identifiable, though, as the loss of goodwill is sufficient. *See Id.* (citation omitted). As stated above, the use of the offending mark on completely internal documents cannot be said to harm the plaintiff, even in terms of a loss of goodwill. Accordingly,

total net sales dollars relating to the use of the WING FLINGS mark in bills of lading, sales orders, and invoices should not be included in the civil monetary sanction from which net profits will be derived, as they are unrelated to any sales that could have harmed Hester.

### 2. Pricing documents

#### i. Trial evidence

■ ■ The next category of materials allegedly damaging Hester for use of the WING FLINGS mark is pricing documents. The evidence at trial established that pricing documents, such as price lists identifying various Tyson products, and the corresponding price, are provided to Tyson sales brokers and certain customers, such as the price club customers, e.g., Price/Costco. In particular, it was established that pricing documents using the WING FLINGS mark were provided to club store customers for products bearing the 7563–916 and 9612–939 product codes during the time period month ending January 2, 1993 through October 29, 1994. Those product codes represent IQF product sold exclusively to Price/Costco. In addition, the evidence established that the WING FLINGS mark was used on price lists provided to outside sales brokers for the product bearing the 141–928 product code, for the time period month ending August 29, 1992. The net sales dollars for this time period is $1,817,795.

These outside brokers, such as Morris Alper & Sons, are agents of Tyson,[2] and the testimony at trial established that the brokers provided pricing documents using the offending mark to customers. Those customers, such as retail grocery stores, then used the information in the pricing documents in advertising targeted to the ultimate consumer. There was no testimony, however, that the pricing documents were shown to the ultimate consumers of the chicken wings products. The question then arises, at what

---

**2.** Tyson sales/food brokers were trained by Tyson, and provided with Tyson documentation, including order forms, sales materials, and pricing documentation. Moreover, the brokers never took possession of the goods sold, bore no risk of loss, had no input on pricing, and did not arrange for shipping or billing. Finally, some brokers were periodically given the authority to draw checks from Tyson accounts in relation to sales promotions. The above factors establish an agency relationship between the brokers and Tyson. *See Cabrera v. Jakabovitz*, 24 F.3d 372, 385 (2d Cir.1994).

level of customer does compensable damage to the plaintiff occur? Wing products form both Hester and Tyson typically are sold through food brokers, who then sell the products to distributors, who in turn sell to retail stores, and then the ultimate consumer. However, Tyson also sells directly to club stores, who then resell the product to its customers.

In *Manhattan Industries,* the plaintiff was compensated for sales made to the ultimate consumer. *See* 885 F.2d at 7. The *Manhattan Industries* Court did not discuss the distribution chain, or the limits on what would constitute damage to the plaintiff However, the Court in *Manhattan Industries* did rest its award of damages on a general theory of unjust enrichment. *See* 885 F.2d at 6–7. In the instant case, Hester and Tyson are competitors in a number of markets, including the food club market. Accordingly, use by Tyson of the offending mark in its pricing documents could harm Hester's goodwill in relation to Tyson. Stated another way, Tyson treated its club stores as customers, and competed with Hester for club store business. Thus, the use of the offending mark in connection with the pricing documents shown to those customers arguably may have provided a benefit to Tyson, and a corresponding injury to Hester. *See Manhattan Indus.,* 885 F.2d at 6. Accordingly, the net sales dollars relating to club sales uses of pricing documents bearing the WING FLINGS mark are includable in the sanction amount. *See* 885 F.2d at 6–7.

Similarly, there was evidence at trial that the pricing documents relating to product code 141–928 also was shown to customers by Tyson food sales brokers. Accordingly, net sales dollars for the time period associated with this use of pricing documents is includable in the monetary sanction amount.

### ii. Adverse inference

■ The Court notes that the evidence of price lists was provided by Tyson to Hester for only two of five Price/Costco sales regions, despite a clear request for all price lists, Accordingly, the Court must consider whether to draw an adverse inference from the failure of Tyson to produce such documents.

There is a split of authority on whether a finding of bad faith is necessary for an adverse inference to be appropriate. *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 74–75 (S.D.N.Y.1991) (discussing case authority on this issue). Some courts have held that an adverse inference is appropriate only when the spoilation of or failure to preserve evidence was intentional. *See, e.g. Britt v. Block,* 636 F.Supp. 596, 606–07 (D.Vt.) ("Destruction of records through misunderstanding or negligence is not sufficient to supply evidence or recast the burden of proof"), *aff'd mem.,* 805 F.2d 390 (2d Cir. 1986); *INA Aviation Corp. v. U.S.,* 468 F.Supp. 695, 700 (E.D.N.Y.1979) ("one cannot justify the drawing of [an adverse] inference where the destruction of evidence is unintentional or where the failure to produce evidence is satisfactorily explained"). Other courts have held that the negligent or reckless destruction of evidence may warrant the imposition of an adverse inference against the spoliator. *See, e.g., Pressey v. Patterson,* 898 F.2d 1018, 1024 (5th Cir.1990); *Nation–Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 219 (1st Cir. 1982); *Turner,* 142 F.R.D. at 75–76. The rationale behind a sanction for negligent conduct is that "[t]he adverse inference provides the necessary mechanism for restoring the evidentiary balance." *Turner,* 142 F.R.D. at 75. As the Court noted in *Turner,* "[t]he inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." *Id.*

The Second Circuit has stated that "one cannot justify the drawing of . . . an [adverse] inference where the destruction of evidence is unintentional." *Berkovich v. Hicks,* 922 F.2d 1018, 1024 (2d Cir.1991), *quoting, INA Aviation Corp.,* 468 F.Supp. at 700. However, *Berkovich* expressly limited that holding to the facts of that case. *See Id.* Thus, it remains unclear whether this Circuit would permit the drawing of an adverse interest for the failure to preserve evidence on the basis of negligence. In the instant case, the initial issue is whether the defendant had

a duty to preserve pricing documents for all regions relating to Price/Costco.

Generally, "no duty to preserve arises unless the party possessing the evidence has notice of its relevance." *Turner*, 142 F.R.D. at 72–73, *citing, Danna v. New York Telephone Co.*, 752 F.Supp. 594, 616 n. 9 (S.D.N.Y.1990). The dispute as to the use of the WING FLINGS mark dates back to the filing of a Complaint with this Court in the precursor action in 1989. Moreover, in April 1992, the Court expressly ordered Tyson to stop all uses of the offending mark. The Court concludes, therefore, that Tyson was given sufficient notice to give rise to a duty to preserve all documents relating to the dispute as to use of the offending mark, of which pricing documents clearly are a part. *See generally Id.* (and cases cited therein). Having determined that the defendant had a duty to preserve the pricing documents, the Court must next consider whether the sanction of drawing an adverse inference is appropriate in this case. This inquiry focuses on the state of mind of the defendant and the content of the evidence no longer available. *See* 142 F.R.D. at 74, 76.

As to the state of mind of the defendant, the Court first notes that there is no evidence of intent on the part of Tyson to fail to preserve the pricing documents in question. However, the Court concludes, as did the *Turner* Court, that intent, although a significant factor, is not *required* for the drawing of an adverse inference. 142 F.R.D. at 76. Rather, given that Tyson had a duty to preserve, and given the extensive discovery that had been engaged in prior to the time period at issue with respect to these missing documents (prior to late 1992 through late 1994), the Court concludes that mere negligence is sufficient in this case. *See Id.*

Finally, as to the content of the documents, the Court must determine if there is "a nexus between the proposed inference and the information contained in the lost evidence." *Id.* Clearly, given that the pricing documents relating to two Price/Costco sales regions used the offending mark, it is reasonable to infer that the pricing documents relating to the other three regions also used the offending mark. In addition, Price/Costco Invento-

ry Control Specialist stated, without qualification, in his deposition that Price/Costco received pricing documents from Tyson using the WING FLINGS mark.

For the reasons stated above, the Court draws an adverse inference from the missing documentation, and concludes that all pricing documents provided to Price/Costco for the relevant period used the offending mark.

The Court, therefore, concludes that a total net sales dollars amount of $8,542,422.00 should be included in the sanction amount.

### 3. Packaging and Labels

Finally, in regard to the packaging and labels allegedly using the WING FLINGS mark, the Court concludes that the sanction award properly should include the net sales dollars for the time periods relating to packaging, but not labels.

As to the packaging, there was ample evidence that Tyson continued to order packaging, used packaging, and, in fact, sold product in packaging using the WING FLINGS mark after the deadlines for ceasing use had passed. Hester produced noncompliant packages at trial, purchased after the Settlement Agreement deadlines. Tyson admitted that it had ordered packaging after the deadlines, and admitted that certain Tyson facilities continued to stock varying levels of noncompliant packaging inventory, evidencing use, after the deadlines set forth in the Settlement Agreement. Clearly, packaging is seen by Tyson customers, and thus, net sales dollars for the offending periods are appropriately included in the civil contempt sanction. *See Manhattan Indus.*, 885 F.2d at 6–7. Noncompliant packaging was used by Tyson for the product codes 146–928, 9611–928, 9612–939, and 7563–916 for the time period month ending January 2, 1993 through March 6, 1993. The total net sales dollars for that time period amounts to $2,104,722.

As to the alleged offending labels, the trial testimony and deposition transcripts evidenced that such labels were ordered and in fact used by Tyson after the Settlement Agreement deadlines. However, the testimony also established that Tyson relabeled

those boxes discovered to have been mislabeled. Many of these boxes had not yet left a distributor, or had not yet been displayed in a retail outlet. In the absence of greater factual detail, the Court cannot determine what amount of net sales dollars, if any, arguably were derived from the offending mark's use on Tyson labels. Accordingly, any such net sales dollar figures may not properly be included in the civil monetary sanction amount.

The Court concludes that there was no evidence at trial of any other offending uses of the WING FLINGS mark by Tyson from which Tyson arguably could have derived profits. Thus, the Court concludes that the appropriate civil monetary sanction to be imposed against Tyson should includes those net sales dollars amounts relating to the offending time period set forth herein for packaging and pricing documents. The award amounts to net sales dollars of $9,732,-054.00, for sales of 13,095,736 pounds of IQF product, after deductions for duplication.[3] However, this does not end the Court's task of arriving at an appropriate monetary sanction to compensate Hester for its loss resulting from Tyson's use of the WING FLINGS mark.

### D. Cost of Goods Sold

██ As instructed by *Manhattan Industries,* after determining the sanction amount, the burden now shifts to the contemnor, Tyson, to establish costs that should be applied to the sanction amount, thereby reducing that amount, and resulting in a net profit figure. *See Manhattan Indus.,* 885 F.2d at 7 ("the burden is on the contemnor 'to prove any deductions for its costs from the gross revenues attributable to its contempt.' "), *quoting, Oral–B Laboratories, Inc. v. Mi–Lor Corp.,* 810 F.2d 20, 26 (2d Cir.1987). This net profit is called net margin dollars by Tyson.

Tyson attempts to reduce the net sales dollars figure by application of a costing method called the "Take Out Value" method. The Take Out Value method is the method used by Tyson to set a figure for the cost of goods sold. The cost of goods sold is deducted from the net sales dollars to arrive at the net margin dollars.[4]

The Take Out Value figure is set by a Tyson executive, and adjusted at irregular intervals, based on a so-called Urner–Barry report. The Urner–Barry report is a weekly industry publication that indicates the average selling price[5] of a commodity, such as chicken wings. Thus, the Take Out Value (or cost of goods sold by Tyson) varied in relation to the predicted market price fluctuations.

The testimony at trial established that the Take Out Value was usually set at a figure that the Tyson executive thought or had a "gut-feeling" would be some measure below the Urner–Barry figures in the future.[6] If the Take Out Value, in fact, fell below the Urner–Barry price, Tyson showed a profit for the period. If the Take Out Value did not fall below the Urner–Barry price, Tyson showed a loss for the period. However, this method of costing a product is flawed to the extent that it is used to calculate a net profit amount. As even stated by the defendant's expert, James Nawrocki, if one aims at market price as the cost of a product, and overestimates, such that the cost (Take Out Value) exceeds the true market price, the profit of other parts of the chicken, e.g., the breast, is increased. This, of course, occurs as a result of market price fluctuation, not actual cost to the producer.

The plaintiff's expert, James Chadbourne, criticized the use of the Take Out Value as a costing method, or component of deriving profit/loss, primarily because it is not based on the true historical cost to Tyson of pro-

---

3. For example, if a month ending net sales dollars figure related to noncompliant use of the WING FLINGS mark on both packaging and pricing documents, the Court included the figure once.

4. There was testimony that certain other costs, such as selling costs may have been deducted as

well. However, no figures were provided quantifying such costs.

5. The selling price, by definition includes historical cost and profit.

6. Apparently, there was a rather predictable cycle to chicken wing market prices.

ducing a chicken wing product. In other words, the Take Out Value does not consider that portion of the growing cost attributable to the wing (as opposed to the breast, legs, etc. ... ), the actual costs of production associated with separating and processing the wing for packaging, the packaging, storage, and transportation costs, or any selling costs. According to Chadbourne, although the Take Out Value may be appropriate for internal decision-making purposes, it is not appropriate for cost accounting purposes, i.e., ultimately determining profit or loss.

The Court finds that the Take Out Value is an inappropriate method for determining the cost of goods sold, and thus, ultimately net margin (profit/loss). The Take Out Value does not reflect any documented true measure of that portion of the net sales dollars that exceeds the historical cost to Tyson of producing an IQF chicken wing product. Without some historical basis for determining the cost, any net margin is suspect, because it reflects the whim of Tyson, rather than economic reality. If, for example, Tyson makes a business decision that it wants its breast products to be more profitable, it can increase its Take Out Value for wings, transfer profit to other products, and show less profit, or a loss for chicken wings. This can be done without regard for what it actually costs Tyson to produce the wing products, or any other products.[7]

As a simple illustration, assuming a constant market price often cents per pound of raw frozen chicken wings, and a constant historical cost of six cents per pound, Tyson could show as much as a ten cent per pound sold profit, by setting the Take Out Value at zero cents per pound, or a virtually unlimited loss, by setting the Take Out Value at any figure above ten cents per pound. This profit or loss could be whatever best serves Tyson's business purposes, but would not reflect economic reality.

Although the Court declines to follow the Take Out Value, it recognizes that the decision not to use the Take Out Value leads to an absurd result, from an economic standpoint, and a problematic result for Tyson, from a legal standpoint. The reason is that Tyson has failed to set forth any evidence of an alternative costing method for the Court. In the absence of cost data, the Court cannot make deductions to the net sales dollars amount arrived at for a monetary sanction, and thus, must award the full net sales dollars to the plaintiff. *See New York Racing Ass'n v. Stroup News Agency Corp.*, 920 F.Supp. 295, 301 (N.D.N.Y.1996) (and cases cited therein); *Manhattan Indus.*, 885 F.2d at 7. Certainly, Tyson has data relating to the cost of producing, processing and selling chicken wing products. However, virtually none of that data was provided during discovery or was offered at trial. The only alternative cost data presented to the Court, was provided by the plaintiff's expert.

The plaintiff's expert testified that he used the Tyson Weekly Packing Cost Reports to determine that the average fixed cost for producing Tyson IQF products was 2.92 cents per pound, and the average variable processing cost was 5.73 cents per pound. The plaintiff's expert opined that the fixed costs should not be used in connection with the cost of goods sold, because they were incurred regardless of whether a single chicken wing or many were produced. There simply was no factual evidence to support this conclusion offered at trial. Accordingly, the Court will use the plaintiff's figures, as derived from the defendant's Weekly reports to arrive at a cost figure of 8.65 cents per pound, as the cost of goods sold for the IQF product.

The total net sales dollars comprising the civil monetary sanction is $9,732,054.00. The total pounds of IQF product sold in the offending periods, and within the ambit of the civil sanction penalty, is 13,095,736 pounds of IQF product. With a cost figure of 8.65 cents per pound, or 0.0865, the Court will reduce the sanction amount by $1,132,781.16.

---

7. The Court understands that, as suggested by both parties' experts, making estimates to facilitate allocation of costs is an appropriate accounting practice, particularly when multiple products are produced from a single source—a grown and gutted chicken (WOG). However, for the purposes of calculating net profits, such allocation must relate to the true historic cost, not the anticipated market price.

The resulting sanction amount is $8,599,-272.84.

### E. Attorney's Fees

 Although sanctions for civil contempt can be imposed without a finding of willfulness, *Canterbury Belts, Ltd. v. Lane Walker Rudkin Ltd.*, 869 F.2d 34, 39 (2d Cir.1989), *see also Manhattan Indus.*, 885 F.2d at 5, the Court may consider a contemnor's intent in determining an appropriate sanction. *Canterbury Belts*, 869 F.2d at 39. This is particularly relevant where, as in this case, the plaintiff seeks costs and attorney's fees.

"[I]t is well-settled that the costs of prosecuting a party's contempt are recoverable where the violation of the court order has been 'willful.'" *Upjohn*, 894 F.Supp. at 136, *citing Manhattan Indus.*, 885 F.2d at 8; *Vuitton*, 592 F.2d at 130–131. However, "willfulness is [not] necessarily a prerequisite to a fee award, but rather [ ] willfulness is a commonly accepted justification for awarding attorney fees." *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1535 (11th Cir.1986), *see also Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996) ("Thus, while willfulness may not necessarily be a prerequisite to an award of fees and costs, (footnote omitted) a finding of willfulness strongly supports granting them."). In *Manhattan Industries*, declined to disturb a lower court's finding that, although the contemnor had displayed a " 'callous disregard for the rights' " of the plaintiff and the " 'mandates of the federal courts,' " such conduct did not rise to the level of intent, and thus, would not mandate an award of attorney's fees.

 In the instant case, the Court finds that Tyson has exhibited no more than a callous disregard for the rights of Hester, in that it failed to diligently police its compliance with the Dismissal Order. However, the Court does not find that Tyson willfully sought to gain an economic benefit by using the WING FLINGS mark. Accordingly, the Court declines to award the plaintiff attorney's fees and costs.

### III. CONCLUSION

 Based on the foregoing findings of fact and conclusions of law, the Court hereby ORDERS that judgment should be entered for the plaintiff, Hester Industries, Inc., in the amount of $8,599,272.84 plus interest.

**IT IS SO ORDERED.**