**Barbara A. LAMARCA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CV–96–2266 (ETB).**

United States District Court, E.D. New York.

Dec. 9, 1998.

Order Amended Jan. 11, 1999.

Ira H. Futterman, Pearlman, Apat & Futterman, Kew Gardens, NY, for Plaintiff.

Jennifer C. Boal, United States Attys. Office Civil Division, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

BOYLE, United States Magistrate Judge.

The plaintiff, Barbara LaMarca ("Mrs.La-Marca"), brings this medical malpractice action against the United States pursuant to the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 1346(b), which confers exclusive jurisdiction on the district court for actions for money damages against the United States for:

> personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where

the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C.A. § 1346(b)(1) (1998). Mrs. La-Marca seeks compensation for pain and suffering on behalf of her husband, the decedent Joseph Patrick LaMarca ("Mr.LaMarca"), and also damages for wrongful death.

This medical malpractice action stems from an incident that occurred at the Northport Veteran's Administration Hospital at Northport ("Hospital" or "Northport Veteran's Hospital") in 1994. Mr. LaMarca, a patient at the Hospital, fell out of bed, fractured his right hip and died less then four months later.

Pursuant to 28 U.S.C. § 636(c), the parties consented to have the above-captioned action tried before me. *See Consent to Magistrate Judge Trial,* dated December 22, 1997. A bench trial was held on June 15, 1998. For the reasons stated below, I find for the plaintiff Barbara LaMarca and direct an award of $400,494 in her favor. This Memorandum Opinion and Order constitutes my findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. BACKGROUND

On April 11, 1994, Mr. LaMarca, was admitted as a patient to Northport Veteran's Hospital. On April 12, 1994, he fell out of bed in the Hospital and fractured his right hip. On August 4, 1994, at the age of 64, Mr. LaMarca died while still a patient of the Hospital. The plaintiff, Barbara LaMarca, decedent's wife, claims that the Hospital breached its duty to her husband when it failed to adhere to generally accepted standards of nursing care by not designating her husband as a fall risk.[1] Plaintiff further alleges that as a result of this breach, Mr. LaMarca fell out of bed, broke his hip and died from complications resulting from his injury.

### A. Before the Fall

#### 1. Medical History

Mr. LaMarca was diagnosed with arthritis in 1975 and was advised by his doctor to seek treatment at the Northport Veteran's Hospital. Tr. 18. After approximately six years of unsuccessful treatment he was put on Prednisone which relieved some of his symptoms and which he continued to take until his death. Tr. 19.

Mr. LaMarca also suffered from heart disease, including congestive heart failure ("CHF"), and atherosclerosis. Tr. 20, 26, 228. Mr. LaMarca suffered his first of seven heart attacks in 1980. Tr. 20. It was at this time that he was diagnosed with heart disease. He remained in the Hospital for about two weeks. Id. Within a year he suffered another heart attack, and was again brought to the Hospital, treated for two weeks and released. Tr. 21. A year later, Mr. LaMarca suffered his third heart attack. Id. Six months later he suffered his fourth heart attack. Tr. 22. Both times he was also treated for two weeks and then released. Some time between 1984 and 1989 Mr. LaMarca suffered his fifth heart attack and thereafter underwent quadruple bypass heart surgery at Stony Brook Medical Center. Tr. 23–24. After the bypass, Mr. LaMarca suffered two more heart attacks; one about two years later, after which he was diagnosed with congestive heart failure, and the last one in 1994. Tr. 24–25.

#### 2. Admission

On the morning of April 11, 1994, while at the Hospital's arthritis clinic, Mr. LaMarca experienced dizziness and shortness of breath, and was unable to walk. Tr. 26–28. He was taken by ambulance to the Hospital's emergency room and several hours later was placed in the Intensive Cardiac Care Unit ("ICCU"). Tr. 29–31. Mrs. LaMarca stayed with her husband in ICCU for about ten minutes and then left when she was told that

---

**1.** The Fall Risk Program ("Fall Risk") is an alert to all Hospital staff that a particular patient, as a result of illness, injury or medication, is at risk of falling. When a patient is on fall risk all Hospital staff must follow certain protocols which in-

clude keeping the patient's bed rails up at all times. Tr. 132. It is the nursing staff that generally determines whether a patient is a fall risk. Tr. 130.

he was being moved to telemetry.[2] Tr. 33. She returned to the Hospital with her daughter-in-law at about six p.m. that evening for a visit which lasted about two hours. Tr. 36.

### 3. Treatment in the Emergency Room

On the day he was admitted Mr. LaMarca was taking several medications; Digoxin, Captopril, Prednisone, Lasix, Lopressor and Surfak Puffers, an inhalant used for respiratory distress. Tr. 161. When Mr. LaMarca was admitted he was given more of the diuretic Lasix and several other medications which acted as sedatives. Tr. 165. Compazine was administered for nausea which is known to have a sedative effect and may lower blood pressure. Id. He was given Captopril and Buspar, an anti-anxiety medication with a sedative effect. Tr. 166. He was also given Panax, another anti-anxiety medication with a sedative effect, and Benadryl, an antihistamine which causes drowsiness. Tr. 167. Panax and Benadryl both may act to lower blood pressure. Tr. 166-167. Tylox, a strong pain medication was also given. Tr. 206.

Plaintiff's nursing expert witness, Elaine Kinsella, testified that the cumulative effect of the drugs given to Mr. LaMarca, in addition to the drugs he was already taking on a regular basis, would have the effect of rendering him unsteady on his feet and lightheaded. Tr. 172. The court credits this testimony.

### 4. Fall Risk Assessment

The Standard of Nursing Care concerning Patient Fall Prevention, *Plaintiff's Exhibit 7*, at the Hospital, in relevant part, provides that:

1. Patients at risk of falling or being injured will be identified at admission . . . .

\* \* \* \* \* \*

1. The Registered Nurse performing the admission assessment will use nursing judgment to identify whether a patient is at risk for falling. Cues to relative fall risk may include dizziness, (unsteady) gait, (dis)orientation, sensory impairment, mo-

bility difficulties, neurological problems, history of falling.

\* \* \* \* \* \*

4. When a patient is designated as being at risk of falling:

 a. Place "fall risk" sign on bed

 b. Identify patient as a "fall risk" on 24 hour report, at change of shift report and on Patient Care System.

5. Nursing actions designated to aid in the prevention of falls will be listed on the Patient Care System (Nursing Care Plan). These may include:

\* \* \* \* \* \*

 c. Use of side rails and other protective devices

\* \* \* \* \* \*

 i. Toileting every two hours with assistance.

*Plaintiff's Exhibit 7.*

Plaintiff's nursing expert, Elaine Kinsella, testified that a patient is a fall risk when he or she is dizzy or unsteady. Tr. 182-83. A patient should also be designated a fall risk when taking any medications which "suppress thought processes and/or create a hypotensive effect."[3] Tr. 183. Furthermore, a patient's fall risk status should be evaluated whenever he is on any medication which would increase his need to walk, such as diuretics. Tr. 184. When a patient is admitted already complaining of dizziness, weakness and shortness of breath, these factors should also be considered when determining of the patient is a fall risk. Tr. 172. According to government witness Connie Manisero ("Ms.Manisero"), the admitting doctor, Dr. Angell, ordered bed rest for Mr. LaMarca, which meant that he could not leave his bed for any reason. Tr. 293. On his prior admission of March 4, 1994, Mr. LaMarca had been designated a fall risk. Tr. 159. On the April 11, 1994 admission however, Mr. LaMarca was not designated a fall risk. Tr. 177.

---

2. This is a special unit equipped to continuously monitor heart patients. Tr. 232.

3. Hypotensive means the lowering of blood pressure. Tr. 184.

## 5. *The Bed Rails*

The Hospital's beds are equipped with four rails, two upper and two foot rails, located on either side of the bed. Tr. 295. Plaintiff testified that when Mr. LaMarca was first admitted to the ICCU he was placed in bed with all four rails in the upright position. Tr. 32. When plaintiff returned to the Hospital several hours later to visit her husband in the telemetry room, she noticed that the bed rails were down. Tr. 36. The court credits her testimony.

## B. *The Fall*

On April 12, 1994, at around three forty in the afternoon, Mrs LaMarca went to the Hospital to visit her husband. Tr. 39. When she arrived she found him unconscious and became concerned. Tr. 40. After a conversation with one of the patients who shared her husband's room, she discovered that he had been injured in an accident. Tr. 39–42. Mrs. LaMarca asked two staff nurses on duty what had happened to her husband, but she was unable to get any information. Tr. 42.

According to the deposition testimony of Joan Adams, the nurse on duty when Mr. LaMarca was injured, Mr. LaMarca was found lying on the floor at about 11:30 a.m. on April 12. Tr. 119. In the incident report ("report") prepared by her, *Plaintiff's Exhibit 4*, Ms. Adams states that Mr. LaMarca had fallen out of bed but that it was unclear whether he had been trying to get out of bed or had slipped off the side. Tr. 120. According to Ms. Adams, Mr. LaMarca was not placed on fall risk until after he fell. Tr. 119. The court credits this testimony.

According to Ms. Adams's deposition testimony, and her incident report, Mr. LaMarca's bed rails were down before he fell at 11:30 a.m. on April 12. Tr. 124–26. The court credits this evidence. The government, through Ms. Manisero, the head nurse on Mr. LaMarca's unit, asserts that the bed rails were up at 3:01 p.m., on April 12 and that Mr. LaMarca probably fell some time after that because his nursing chart showed the 3:01 entry appearing before a note about the fall. Tr. 295–96. Ms. Manisero also testified that although nursing chart entries are normally made in chronological order, when there is a major event in the treatment of a patient, the chart may not be available for the nurse on duty to make the notation because the chart follows the patient to, for example, x-ray. Tr. 296. The court finds that Mr. LaMarca fell at approximately 11:30 a.m., prior to being put on fall risk and that the chart entry was made later in the afternoon. Ms. Manisero further testified that a notation on the patient's chart of "side rails down," indicates that only the lower two bed rails were down. Tr. 332. The court does not credit this testimony. The government called no witness with personal knowledge of the discovery of the fall.

Ms. Manisero, on cross examination, acknowledged that the nursing flow charts for April 11 and 12 were missing from the patient's nursing records. Tr. 325. She further testified that if a patient was a fall risk, it would be noted on the flow chart. Id. Ms. Manisero testified that she did not remember if the charts were missing during the discovery period when she was interviewed by the United States Attorneys defending this case. Tr. 328. She also testified that she has no knowledge of how patient records are stored at the Hospital and whether or not they may be taken out of the Hospital. Tr. 330. The government offered no evidence that a "fall risk" sign was ever placed on Mr. LaMarca's bed prior to the fall, as set forth in the Standards of Nursing Care (Plaintiff's Exhibit 7). Ms. Kinsella, plaintiff's expert, testified that when she reviewed the patient's nursing records during discovery, the nursing flow sheets for April 11 and 12 were missing. Tr. 155.

## C. *Treatment after the Fall*

### 1. *Malnutrition*

Mrs. LaMarca testified that her husband was unable to feed himself. Tr. 68. This was noted in his chart and the Hospital staff was aware of this. Tr. 188. Plaintiff's nursing expert, Ms. Kinsella, testified that the patient's care plan stated that feeding assistance was required. Tr. 188. When feeding assistance is given for a particular meal, it is noted in the patient's nursing flow chart for

the particular shift in which it occurred. Tr. 188–89. The degree of assistance provided, however, is not noted. Tr. 188. Ms. Kinsella, in reliance on decedent's chart, testified that for the entire month of May, Mr. LaMarca was not assisted with meals and continued to suffer weight loss. Tr 187–89. She further testified that after May there were only sporadic entries of meal assistance. Tr. 191–92. Ms. Kinsella as well as Ms. Manisero, the government's witness, testified that standard nursing practice is to log all patient care in the chart, and that if something wasn't written in the chart it wasn't done. Tr. 194, 323.

The government called no nursing expert in this case, relying instead on the testimony of Ms. Manisero, the head nurse on Mr. LaMarca's unit. Ms. Manisero, relying solely on Mr. LaMarca's charts, testified that Mr. LaMarca was assisted with meals throughout the month of April usually every day and usually three times a day. Tr. 307–08. This is not inconsistent with the testimony of plaintiff's expert since it addresses only the first month of plaintiff's four months of hospitalization prior to his death. Moreover, Mrs. LaMarca testified that on a number of occasions, when she came to visit her husband, she found his meal untouched or out of reach and she would attempt to feed him herself. Tr. 66–69.

In Ms. Kinsella's expert opinion, Mr. LaMarca was not properly nourished at the Hospital. Ms. Kinsella's opinion is based on the sporadic feeding assistance noted on Mr. LaMarca's chart, the low blood albumin and serum protein levels indicated in his medical records, tr. 191, and his continued weight loss as reported in his medical records. Tr. 187–89. Ms. Kinsella testified that because Mr. LaMarca was not getting the nutrition he needed, particularly protein, his body was ill-equipped to repair the broken hip and to improve his general health. Tr. 189–90. The court credits the expert testimony of plaintiff's nursing expert, Ms. Kinsella. The government presented evidence, in the form of expert testimony by Dr. David Tice ("Dr. Tice"), that Mr. LaMarca's weight loss was due to end stage cardiac disease. Tr. 485. The court does not credit this testimony.

### 2. Bedsores [4]

According to the pressure sore evaluation in his medical records, Mr. LaMarca developed bedsores on the heels of his feet and the base of his spine (sacrum) on or around April 25, 1994. *Defendant's Exhibit B* at U.S. 839. The sores on his feet began as Stage I, namely, exhibiting redness and inflammation. Id. The sore on his sacrum was Stage II, meaning the sore had progressed from redness to a blister and skin break. Id.

On April 28, total skin care was ordered by a Hospital physician for Mr. LaMarca consisting of; cleaning the patient three times a day, applying hydrocolloidal bandages to prevent further sores and reduce irritation of already existing sores, the use of an air mattress and foam booties, and repositioning every two hours. *Defendant's Exhibit B* at U.S. 161, 445, 839.

The pressure sore evaluation states that on June 23, Mr. LaMarca's sores had all progressed to Stage II. The sore on his right foot was two centimeters, the sore on his left foot was one centimeter, and the sore on his sacrum was three centimeters. *Defendant's Exhibit B* at U.S. 842. On July 27, the pressure sore evaluation states that Mr. LaMarca had developed a second sore, two centimeters in size, on his sacrum and that both sacral sores had progressed to Stage III, which is a skin break exposing subcutaneous tissue. *Defendant's Exhibit B* at U.S. 844. The July 27 pressure sore evaluation also shows that Mr. LaMarca had two Stage IV sores, meaning a skin break exposing muscle tissue, on the outside of his foot, measuring three centimeters and one-third of a centimeter each. Id. He also developed a two centimeter, Stage III sore on his right ankle, a two centimeter Stage II sore on his

---

4. Decubitus ulcers, commonly called bedsores, form as a result of pressure on the bony prominences of a patient. This pressure cuts off the flow of blood to the area of skin covering the bone, killing the tissue and creating the sore. Turning the patient periodically shifts and relieves pressure on the patient's skin and helps to prevent the development of these sores. Tr. 193–95.

left heel, and a three centimeter, Stage III sore on his left ankle. Id.

According to Ms. Kinsella, Mr. LaMarca's hospital records show that he was not turned and positioned every two hours pursuant to the physician's orders. Tr. 194. It was her opinion that because Mr. LaMarca was not turned every two hours he developed these bedsores. Tr. 195. Ms. Kinsella also testified that the Hospital failed to establish an aggressive schedule of bowel and bladder toileting when Mr. LaMarca became incontinent which exacerbated the tissue breakdown that leads to bedsores by exposing the skin to urine and stool. Tr. 199. Ms. Kinsella states that in addition to regular bowel and bladder toileting, a skin care regimen must be followed wherein the patient is cleaned and the higher risk areas of the skin protected before the sores develop. Tr. 196–98. Ms. Kinsella testified that in addition to the lack of regular rotation, and regular bowel and bladder toileting, there was also no regular skin care provided until after the sores had developed, which is usually too late. Tr. 197. Moreover, Mr. LaMarca was not given foam booties or a special mattress until after the sores developed which was also too late. Tr. 197, 210. The court credits the testimony of Ms. Kinsella as to the cause of Mr. LaMarca's bedsores.

The government argued that Mr. LaMarca was turned and rotated every two hours in accordance with generally accepted nursing practices, and, in addition, was given proper skin and prophylactic care. The patient's chart presented by the government does not to support this claim.

### D. The Cause of Death

Plaintiff's expert, Dr. Patricia Hart ("Dr. Hart"), testified that because Mr. LaMarca was unable to walk, he was unable to remove the fluid from his lungs ("pulmonary toilet") caused by the congestive heart failure. Tr. 352–53. He also developed deep vein thrombosis ("DVT"), which are blood clots that form in the veins and are caused by inactivity. These clots often migrate to other parts of the circulatory system and threaten the patient's health. Tr. 353. Dr. Hart testified that Mr. LaMarca's general health continued to deteriorate because of his extended confinement to bed. Id. Moreover, as established earlier, Mr. LaMarca was malnourished which exacerbated his already weakened condition. Tr. 191. Dr. Hart testified that these factors, in addition to his physical separation from his home and family, contributed significantly to his death. Tr. 354. The court credits this testimony. In Dr. Hart's opinion, although Mr. LaMarca was suffering from serious and chronic heart disease, had he not fractured his hip he probably would have lived at least another three or four years. Tr. 357. The court credits this testimony.

Defendant's expert, Dr. Tice, testified that Mr. LaMarca was in the end stages of cardiac disease when he was admitted in March of 1994, and that was the cause of his death. Tr. 485, 489. Dr. Tice further testified that in his opinion the hip fracture did not contribute to Mr. LaMarca's death. Tr. 489–90. The court does not credit this testimony.

### E. Damages

#### 1. Wrongful Death

Mrs. LaMarca testified that before his death Mr. LaMarca usually drove her to and from work, tr. 81, did some grocery shopping and cooking, watered the lawn, cared for their dog, managed the household finances, tr. 82, and did repair and maintenance on their car. Tr. 86. Mr. LaMarca was father to four adult children; Frederick, Carol, Patricia and Joseph. Tr. 41. Plaintiff testified that Mr. LaMarca also helped repair the cars of other family members. Tr. 86. On cross-examination, Mrs. LaMarca testified that in the week prior to his last hospitalization, her husband needed assistance with his normal daily activities and that a home health care nurse had come on two different days during that week to provide assistance. Tr. 94.

Mr. LaMarca received $845 per month from social security which went towards his maintenance as well as household expenses. Tr. 81. In the absence of the receipt of these monies from social security after her husband's death, Mrs. LaMarca was unable to pay the household bills and it was necessary for her to take out a home equity loan to

refinance the joint debts which she was left to pay. Tr. 83–84. The funeral was $5,284 which was paid by his wife. Id.

### 2. *Conscious Pain and Suffering*

According to plaintiff, Mr. LaMarca appeared to be in considerable and constant pain for the duration of his hospitalization following the accident. Tr. 45–46. Mrs. LaMarca testified that her husband exhibited facial expressions and made groans which she understood as expressions of pain. She also testified that on or about the third week of June, Mr. LaMarca was visited by a patient representative regarding possible admission to a nursing home. Tr. 58. Mrs. LaMarca and her daughter Patricia testified that on one occasion they heard the decedent screaming in pain while hospital staff attempted to give him a spinal tap. Tr. 73, 115. Both mother and daughter testified that the staff had rolled decedent onto his injured hip to expose his back and that a staff member was attempting to muffle his screams by putting a pillow over his mouth. Tr. 73, 116. According to the plaintiff, her husband appeared to be in pain every day until his death, despite the fact that he was on pain medication. Tr. 61, 63. The court credits this testimony.

There was evidence presented of other forms of suffering experienced by Mr. LaMarca. As previously discussed, he was not fed properly and he also developed bedsores. The plaintiff testified that on one occasion she found her husband sitting in a chair soaked in his own urine. Tr. 69. Mrs. LaMarca also testified that her husband groaned in pain when he was moved back to bed after she complained to the staff about finding him in that condition. Tr. 70. Patricia Smith, the decedent's daughter, testified that four days before decedent's death, she found him laying on his side in bed calling for help. Tr. 117. Ms. Smith testified that her father couldn't breathe because of the fluid buildup in his lungs from the congestive heart failure and that this difficulty breathing was clearly audible. Id.

The government, through the testimony of Dr. Robert Goldberg, asserts that between early and mid May, Mr. LaMarca's hip fracture had healed, tr. 525, and that he did not experience much pain after the initial fracture. Tr. 529–30, 549. In forming his opinion on both the fracture and the pain, Dr. Goldberg relied exclusively on the medication entries in Mr. LaMarca's chart and the staff notes made regarding Mr. LaMarca's complaints of pain. Tr. 530. The court does not credit this testimony. On cross-examination Dr. Goldberg conceded that there is no x-ray in Mr. LaMarca's records indicating that the fracture healed, and, in fact, the last x-ray taken, on May 10, indicated that the fracture had not healed. Tr. 588–90. The court credits this testimony. On direct examination Dr. Goldberg testified that acute fractures are painful. Tr. 529. Accordingly, the court finds that Mr. LaMarca experienced pain due to the hip fracture and that as of the date of his death the fracture had not healed.

## II. *MEDICAL MALPRACTICE*

██ A threshold issue is whether plaintiff's allegations constitute medical malpractice or ordinary negligence. "A nurse is legally capable of committing malpractice." *Bleiler v. Bodnar*, 65 N.Y.2d 65, 71, 479 N.E.2d 230, 234, 489 N.Y.S.2d 885, 889 (1985) (collecting cases). Not every negligent act of a nurse will constitute medical malpractice, it is only when "the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons . . . ." *Staveley v. St. Charles Hosp.*, 173 F.R.D. 49, 52 (E.D.N.Y.1997) (citations omitted). Furthermore, "[a] claim against a hospital for the negligence of its medical personnel in treating a patient is . . . medical malpractice." *Bleiler*, 65 N.Y.2d at 66, 479 N.E.2d at 230, 489 N.Y.S.2d at 886.

██ In *Staveley*, the court discussed a number of New York cases with fact patterns where an unsupervised patient fell and was injured. *See Staveley*, 173 F.R.D. at 53 (discussing cases). In each case examined, the courts held that the claim sounded in malpractice when it alleged that the patient's medical condition was improperly assessed by the hospital staff. This is the claim made by the plaintiff herein. Mrs. LaMarca alleges that her husband's injuries all stem from

the Hospital's nursing staff's improper assessment of the patient's fall risk status. Because the determination of whether a patient is a fall risk is an act which is a "matter of medical science ... requiring special skills not ordinarily possessed by lay persons," this action involves medical malpractice.

### III. *PLAINTIFF'S POST TRIAL MOTIONS*

A. *Motion to Strike Dr. Tice's Testimony Concerning the Cause of the Hip Fracture*

■ At the close of the proceedings, plaintiff moved to strike the testimony of the government's expert witness, Dr. Tice, as to the cause of decedent's hip fracture. Tr. 629. Plaintiff claims that Dr. Tice's testimony is outside the scope of permissible expert testimony based on Rule 26 of the Federal Rules of Civil Procedure and Dr. Tice's expert report. Id. Plaintiff maintains that Dr. Tice's report gave no notice that he had an opinion as to the cause of the hip fracture. Id. Plaintiff asserts that the omission of this opinion from the report was unfair surprise and that she was denied the opportunity to explore this issue during the deposition of Dr. Tice; thereby limiting her ability to effectively cross-examine the witness at trial. Id.

Federal Rule of Civil Procedure 26(a)(2)(B) states in pertinent part:

> ... disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case ... be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions ....

■ "Expert testimony exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1)." *In re Kreta Shipping, S.A.*, 181 F.R.D. 273, 275 (S.D.N.Y. 1998).

A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless be permitted to use as evidence at a trial ... any witness or information not so disclosed ....

Fed.R.Civ.P. 37(c)(1).

■ "This result is 'self executing' and is an 'automatic sanction' that is designed to provide a strong inducement for disclosure of relevant material that the disclosing party expects to use as evidence." *Fund Comm'n Svce., II, Inc. v. Westpac Banking Co.*, 1996 WL 469660, *3 (S.D.N.Y. Aug.16, 1996) (citing Fed.R.Civ.P. 37(c) advisory committee's note). This duty to disclose information concerning expert testimony is intended to allow "opposing parties to have a reasonable opportunity [to] prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Kreta*, 181 F.R.D. at 275 (citing Fed.R.Civ.P. 26(a)(2) advisory committee's note).

At trial, Dr. Tice testified that patients "on steroid therapy that have osteoporosis either develop spontaneous fractures or fractures related to some type of stressful effort on the leg." Tr. 488–89. Dr. Tice further testified that "patients like this that are found on the floor usually fracture their hip first. When they get out of bed or put weight on the leg, the hip fractures, and the natural thing that happens to them is they fall to the floor .... The fall in itself almost always occurs as a result of the fracture." Tr. 489.

The government contends that this testimony should not be stricken because plaintiff had prior notice of this opinion. *Defendant's Proposed Findings of Fact and Conclusions of Law* at 30, ¶ 9. This argument is without merit. Dr. Tice's report expresses two opinions, one regarding the medical acceptability of not operating on the hip fracture given Mr. LaMarca's state of health, and the other as to the proximate cause of his death. *Tice Report*, dated August 15, 1997 at 2. The report is devoid of an opinion as to the cause of the hip fracture. The report, therefore, did not put plaintiff on notice that Dr. Tice would testify about his opinion as to the cause of the hip fracture.

■ The government also argues that at the deposition plaintiff "asked numerous questions about the hip fracture and had every opportunity to question Dr. Tice about the cause of the hip fracture." This argument fails for two reasons. First, "deposition testimony does not cure deficiencies in the Rule 26(a)(2)(B) notice." *Kolt v. United States,* No. 94 CV 0293E, 1998 WL 214826, \*3 (W.D.N.Y. Apr.24, 1998). *See also Ferriso v. Conway Org.,* No. 93 CIV. 7962, 1995 WL 580197, \*2 (S.D.N.Y. Oct.3, 1995) (the precise requirements of Rule 26 cannot be mooted by deposition testimony). Moreover, the government has not submitted any part of the deposition transcript to support this argument. The government also has failed to demonstrate that its failure to comply with Rule 26 was either "substantially justified" or "harmless." Fed R. Civ. P. 37(c)(1). Therefore, I find that the portion of Dr. Tice's opinion testimony as to the cause of Mr. LaMarca's hip fracture should be stricken. *See Kolt,* 1998 WL 214826, at \*3.

Moreover, even if this testimony were not stricken, the court would not have credited this opinion based upon the particular circumstances here. Mr. LaMarca was found lying on the floor, on his broken right hip. Dr. Tice's opinion that Mr. LaMarca suffered a spontaneous fracture, independent of the fall, is based more upon generalities and less on investigation into the facts of the incident. Tr. 503. Dr. Tice testified that

> old patients or patients like this that are found on the floor usually fracture their hip first. When they get out of bed or put weight on the leg, the hip fractures and the natural thing is they fall to the floor. So they are all found lying down. And when you do the x-ray you see the fractured hip. But the mechanism for its occurrence is the weight bearing that causes the delicate bone structure to break when you put weight on it.

Tr. 489. There is no evidence that Mr. LaMarca was standing or otherwise placing any weight on the hip prior to his fall. The court finds this opinion unconvincing.

B. *Motion for Judgment as a Matter of Law*

At the close of plaintiff's case, and again at the close of trial, plaintiff moved for judg-ment as a matter of law on the issue of the Hospital's negligence under Federal Rule of Civil Procedure 52(c). Tr. 630. In relevant part that subdivision states:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on the issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law . . . .

Fed.R.Civ.P. 52(c)

Subdivision (c) was added in 1991 and the Advisory Committee Notes state, in part:

> The new subdivision replaces part of Rule 41(b), which formerly authorized a dismissal at the close of the plaintiff's case if the plaintiff had failed to carry an essential burden of proof.

Fed.R.Civ.P. 52(c) advisory committee's note.

■ Usually, Rule 52(c) motions are made by the defendant at the close of plaintiff's case and are granted when plaintiff has failed to carry its burden of establishing a prima facie case. *See* Fed.R.Civ.P. 52(c) advisory committee's note; Tr. 480, 482. A technical amendment in 1993 made clear, however, that judgments as a matter of law in non-jury trials are available against both plaintiffs and defendants. *See* Fed.R.Civ.P. 52(c) advisory committee's note; *Sequa Corp. v. Gelman,* No. 91 CIV. 8675, 1996 WL 79876 (S.D.N.Y. Feb 23, 1996) (plaintiff granted 52(c) motion before closing its case); *Maryland Cas. Co. v. W.R. Grace & Co.,* No. 83 CIV. 7451, 1995 WL 562179 (S.D.N.Y. Sept.20, 1995) (plaintiff granted 52(c) motion before end of trial). The standard applicable to a Rule 52(c) motion is as follows:

> The court does not evaluate the evidence under the standards governing a directed verdict. It does not draw any special inferences in the non movant's favor, or con-

sider the evidence in the light most favorable to the non-moving party. Instead the court acts as both judge and jury, weighing the evidence, resolving any conflicts, and deciding where the preponderance lies.

*In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 374 (Bankr.S.D.N.Y.1998) (collecting sources). If the court grants the motion, it must support its judgment with findings of fact and conclusions of law. Fed.R.Civ.P. 52(c). "A judgment under Rule 52(c) operates as a decision on the merits in favor of the moving party." *Regency*, 216 B.R. at 375.

■ Plaintiff claims that because the government did not present an expert witness to rebut her prima facie case of negligence that the court should find for her on this claim as a matter of law. Tr. 630. Plaintiff also claims that the court should find, as a matter of law, that there was conscious pain and suffering because of this negligence. Id. First, plaintiff has not cited any authority, nor can any be found, which indicates that once a prima facie case of negligence is presented that the burden of proof shifts to the defendant who must rebut or lose.

> The proper meaning of 'prima facie case' is that quantum of evidence tending to prove each material fact that a plaintiff must introduce to sustain his burden of going forward with the evidence .... With the evidence in this posture, the trier of the facts may reasonably find for the plaintiff by drawing the permissible inferences favorable to him. This does not mean that the plaintiff is entitled to a directed verdict or that the burden is shifted to the defendant.

*Rehm v. United States*, 183 F.Supp. 157, 159 (E.D.N.Y.1960).

Second, because this is a plaintiff's motion and the court reserved decision until after trial, there is no practical difference between deciding the motion and rendering an opinion on the case in its entirety. *See Regency*, 216 B.R. at 374. Accordingly, the motion for judgment as a matter of law on the issue of negligence and pain and suffering is denied.

■ In addition to making oral motions at the conclusion of trial, plaintiff also asked the court to find that Dr. Tice committed perjury or, in the alternative, strike his testimony entirely because an opinion he expressed at trial was in conflict with an opinion he expressed when deposed. *Plaintiff's Post Trial Memorandum* at 8. Plaintiff annexed a page of Dr. Tice's testimony to her memorandum in which Dr. Tice stated that but for the hip fracture Mr. LaMarca would probably have been stabilized at the Hospital and sent home. *See Tice Deposition* at 64. Dr. Tice's opinion at trial was that the hip fracture did not contribute to Mr. LaMarca's death. Tr 489–91. Plaintiff had an ample opportunity to cross examine Dr. Tice at trial as to this alleged inconsistency. This request for relief is denied.

## IV. WRONGFUL DEATH

■ The substantive law of New York law governs this action. 28 U.S.C. § 1346(b). Section 5–4.1 of the New York Estates Powers and Trusts Law provides that a personal representative of a decedent may maintain a wrongful death action provided the defendant "would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." This language means "that no action may be maintained by the representative unless the decedent, at the time of his death, could have maintained an action for the underlying tort." *Dundon v. United States*, 559 F.Supp. 469, 475–76 (E.D.N.Y. 1983). Mr. LaMarca would have been able to maintain an action for medical malpractice had he not died, and therefore, this action is properly brought by the plaintiff.

There are four issues presented in this case: (1) Whether the Hospital breached a duty of care to Mr. LaMarca by departing from generally accepted standards of medical or nursing care; (2) whether this breach caused Mr. LaMarca's hip fracture; (3) whether this breach was the proximate cause of Mr. LaMarca's death; and (4) damages.

■ In order to establish a claim of "medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the ·breach proximately

caused the plaintiff's injuries." *Milano v. Freed,* 64 F.3d 91, 95 (2d Cir.1995); *Arkin v. Gittleson,* 32 F.3d 658, 664 (2d Cir.1994) (citing New York cases).

## A. *Breach of Duty of Care*

Plaintiff presented expert testimony that the Hospital departed from the generally accepted medical and nursing standards of the community. To establish a prima facie case of medical malpractice in New York, a plaintiff must present expert medical testimony on the issues of negligence and causation. *See Sitts v. United States,* 811 F.2d 736, 739 (2d Cir.1987); *Fiore v. Galang,* 64 N.Y.2d 999, 1001, 489 N.Y.S.2d 47, 48, 478 N.E.2d 188, 189 (1985) ("except as to matters within the ordinary experience and knowledge of laymen, ... expert medical opinion evidence is required" to make out both elements of malpractice); *Gibson v. D'Amico,* 97 A.D.2d 905, 906–07, 470 N.Y.S.2d 739, 741 (3d Dep't 1983) (explaining that medical malpractice actions generally require "expert opinion testimony of the standard of care in the community"), *appeal denied,* 61 N.Y.2d 603, 472 N.Y.S.2d 1027, 460 N.E.2d 1360 (1984). Such testimony is required to assist the trier of fact to understand and determine what constitutes reasonable care. *See Sitts* 811 F.2d at 740.

### 1. *Fall Risk*

Mr. LaMarca was not designated as a fall risk when he was admitted to telemetry, even though the admitting physician, Dr. Angell, ordered complete bed rest for him. Complete bed rest means that the patient may not leave his or her bed for any reason. By not placing Mr. LaMarca on fall risk, the Hospital failed to follow Dr. Angell's orders. By not following the admitting physician's orders, the Hospital departed from generally accepted standards of care in the community thereby breaching its duty of care to Mr. LaMarca.

In addition to the Hospital's failure to follow doctor's orders, the circumstances of Mr. LaMarca's admission alone called for placing him on fall risk. He came to the emergency room in a weakened, dizzy and unsteady condition. He was transported in a wheelchair because he was unable to walk. He was taking a number of different medications which had sedative, hypotensive, and diuretic effects, and he was administered additional medications with similar effects. He suffered from osteoporosis and severe arthritis, which hampered his mobility and caused him to have "brittle bones." Tr. 547. The court credits the testimony of plaintiff's expert, Elaine Kinsella, who testified that, under the circumstances present here, the Hospital violated community standards for appropriate nursing care by not taking fall risk precautions. Tr. 180.

Moreover, Ms. Kinsella's opinion is corroborated by the fact that the Hospital breached its own standards of nursing care by not designating Mr. LaMarca a fall risk. The nursing staff is required to determine if a patient is a fall risk upon admission by evaluating a number of factors including; whether the patient is dizzy or unsteady, and whether he or she is taking any medication which would suppress thought functions, lower blood pressure, or increase the need to walk, such as diuretics. Fall risk evaluations are made on a case-by-case basis, and although no one factor is dispositive, it is clear that Mr. LaMarca satisfied a number of the fall risk criteria. Moreover, he had been designated a fall risk on his last admission from which he had been discharged only two weeks prior. Accordingly, I find that the Hospital breached its duty to Mr. LaMarca by not designating him a fall risk in accordance with generally accepted community standards as well Hospital standards of nursing care.

### 2. *Nutrition*

Hospital patients must be provided adequate nutrition. Mrs. LaMarca testified that on numerous occasions she found her husband's meals out of reach or untouched. Plaintiff's expert testified that according to his chart, Mr. LaMarca was not assisted with meals for the entire month of May, and only sporadically after May. She further testified that Mr. LaMarca's charts also show that he continued to suffer weight loss and exhibited low blood albumin and serum protein levels, both indicators of improper nutrition. The

government's testimony that he was properly assisted throughout the month of April is insufficient in view of the fact that plaintiff was hospitalized until August 4. Accordingly, I find that defendant breached its duty of care with respect to assisting Mr. LaMarca in order to provide him with adequate nutrition.

### 3. *The Bedsores*

■ Plaintiff's expert, Ms. Kinsella, testified that according to the patient's chart, Mr. LaMarca was not rotated regularly and developed bedsores on his heels and sacrum. Inadequate treatment caused these bedsores to increase in number and severity throughout his period of hospitalization. She also testified that his chart shows he was not toileted regularly nor was he given the ordered skin care regimen on a consistent basis, both of which served to exacerbate the deterioration of his skin. Finally, Ms. Kinsella testified that the chart indicates that Mr. LaMarca was not given prophylactic foam booties or a special mattress until after the sores developed. This testimony is corroborated by the pressure sore evaluation included in Mr. LaMarca's medical records.

Defendant does not dispute that Mr. LaMarca should have been turned at least every two hours, and also should have been given prophylactic skin care, such as foam booties to protect the heels of the feet, a specially cushioned mattress pad to help alleviate bone pressure on the skin, and a regular skin care regimen of skin cleansing and application of gel protectants to areas showing Stage I tissue damage. Through the testimony of Ms. Manisero, the government claims Mr. LaMarca received proper skin care. Ms. Manisero did not treat Mr. LaMarca's skin herself, rather, it was her staff, under her direction, who actually treated him. Tr. 298. Ms. Manisero testified by reading directly from Mr. LaMarca's chart. She recited the skin care treatment noted on the chart for a number of days in April, but not nothing thereafter. Tr. 301. Moreover, even the April entries she relied upon indicate that Mr. LaMarca was not always given the proper skin care treatment. For example, while she testified that the April 13 entry

shows that Mr. LaMarca was rotated every two hours on every shift and given skin care treatment on every shift, the April 14 entry states he was rotated and given skin care on only two shifts. Tr. 301–02. The April 15 entry states that he was given skin care on two shifts and rotated every two hours on only one shift. Tr. 302. The April 16 entry states that he was given skin care on all three shifts but rotated on only one shift. Id. The April 17 entry states that he was given skin care on three shifts but rotated on two. Id. The April 18 entry states he was given skin care and was rotated on only two shifts. Tr. 302–03. The balance of the chart entries recited by Ms. Manisero for the month of April were similarly sporadic. Moreover, there was no testimony elicited from a government witness regarding Mr. LaMarca's skin care treatment after April. Accordingly, the court finds that the Hospital breached its duty of care to Mr. LaMarca by not following generally accepted medical practices regarding his skin care. The court credits the testimony of plaintiff's nursing expert, Ms. Kinsella, based on the patient's hospital records. The plaintiff has established that the Hospital breached its duty of care owed to the patient to prevent and treat the bedsores.

### B. *Causation*

■ Having established that a duty was breached, the plaintiff must also "establish that defendant's negligence was the proximate cause of plaintiff's injury." *Dia v. Conrad,* No. 85 CIV 1471, 1988 WL 96020, at \*2 (S.D.N.Y. Sept.6, 1988) (citing *Monahan v. Weichert,* 82 A.D.2d 102, 106, 442 N.Y.S.2d 295, 297 (4th Dep't 1981), *rev'd on other grounds,* 93 A.D.2d 984, 461 N.Y.S.2d 633 (4th Dep't 1983)). "Plaintiff has the burden of producing expert medical testimony showing proximate cause in medical malpractice actions." *Hegger v. Green,* 646 F.2d 22, 28 (2d Cir.1981); *Monahan,* 82 A.D.2d at 107, 442 N.Y.S.2d at 298 ("ordinarily expert medical opinion testimony is required to establish proximate cause"). "Proximate cause is often described as that which in a natural and continuous sequence, unbroken by any new cause, produces the event, and without which that event would not have occurred." *Has-*

*sanein v. Avianca Airlines,* 872 F.Supp. 1183, 1189 (E.D.N.Y.1995) (citation omitted). Moreover, proximate causation requires that the injury be a "reasonably foreseeable result of the negligence." *Id.* (citations omitted).

> The requirement that the injury must be one that was reasonably to be foreseen does not mean that the exact occurrence or the precise injury resulting from the act need be foreseen, all that is necessary is that the person charged with negligence should have been able to foresee that some injury to some person might result from his act.

*Hoggard v. Otis Elevator Co.,* 52 Misc.2d 704, 707, 276 N.Y.S.2d 681, 687 (Sup.Ct.1966).

Before evaluating the causation required to establish liability, I address the issues of drawing a negative inference from the government's failure to produce certain documents and certain witnesses.

### 1. *The Missing Flow Charts*

 The government failed to produce the nursing flow charts for April 11 and 12. These are the only known missing records of more than a thousand pages of patient records for Mr. LaMarca. While the intentional destruction of evidence may lead to an adverse presumption that the evidence contained information detrimental to the possessor, "[i]t is unclear whether this Circuit would permit the drawing of an adverse inference for the failure to preserve evidence on the basis of negligence." *Hester Indus., Inc. v. Tyson Foods,* 985 F.Supp. 236, 246 (N.D.N.Y.1997) *vacated on other grounds* 160 F.3d 911, 1998 WL 801905 (2d Cir.1998). Generally, "in order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed." *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998). A party is on notice "once it has received a discovery request." *Turner v. Hudson Transit Lines,* 142 F.R.D. 68, 73 (S.D.N.Y. 1991). In addition, "the complaint itself may alert a party that certain information is relevant," and even in the absence of a filed complaint a party may otherwise be placed "on notice that litigation is likely to be commenced." *Id.* Once the court has determined that the possessing party had a duty to preserve the evidence, the court must next consider whether drawing an adverse inference is appropriate in the particular case by considering first, "whether the evidence was intentionally destroyed, and [second] the likely contents of that evidence." *Kronisch,* 150 F.3d at 127. With respect to the intent of the possessor of the evidence, "bad faith, while a significant consideration, should not be an absolute prerequisite to drawing an adverse inference." *Turner,* 142 F.R.D. at 76. As to the content of the missing evidence, the court must determine if there is "a nexus between the proposed inference and the information contained in the lost evidence." *Id.* Moreover, the plaintiff is not entitled to an adverse inference from the non-production of evidence unless it has first established its prima facie case. *See Vanity Fair Paper Mills v. Federal Trade Commission,* 311 F.2d 480, 486 (2d Cir.1962) ("the inference from the non-production of evidence cannot be availed of by a party having the burden of persuasion until the burden of producing evidence has shifted").

The government conceded, through the testimony of Ms. Manisero on cross-examination, that the nursing flow charts for April 11 and 12 were missing. Ms. Manisero testified that these flow charts would have indicated whether Mr. LaMarca had been placed on fall risk before he fell. Ms. Manisero testified also, however, that she did not remember when she last saw the missing flow charts and that she did not know the storage and retention practices of the Hospital. There was no testimony concerning when the flow charts were lost or missing.

 When a patient is injured while being treated in a hospital, it is reasonable to expect that litigation may soon follow. This is particularly so when the patient dies only a few months after the accident. Thus, the court is satisfied that the defendant was provided adequate notice to trigger its responsibility to preserve all patient records in this case. However, that does not end the inquiry.

■ The court must also determine whether the evidence was intentionally destroyed and whether there is a nexus between the adverse inference sought and the content of the missing evidence. An adverse inference that "the missing evidence is harmful can be rebutted by an adequate explanation of the reason for non-production." *Transnor (Bermuda) Ltd. v. BP North America Petroleum,* 738 F.Supp. 1472, 1484 (S.D.N.Y.1990). The government has not offered any explanation as to why they were unable to produce these documents, which leads us to the final inquiry, "whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction." *Kronisch,* 150 F.3d at 127. Plaintiff argues that because the nursing flow sheets have a place where "fall risk" should be indicated, and that these records are missing, "the Court . . . [should] take the most stringent view that it can for defendants (sic) with regard to these missing documents." Tr. 640.

At trial, the government, through the testimony of Ms. Manisero, claimed that the bed rails were up at 3:01 p.m., on April 12. Tr. 295–96. The government also attempted to prove that Mr. LaMarca fell some time after 3:01 because his nursing chart showed the 3:01 entry of "bed rails up" appearing before a note about the fall. Id. As stated earlier, the court does not credit this contention. The government on summation stated that "staff at the Northport V.A., for which the government takes full responsibility, [made the decision] not to place Mr. LaMarca on fall risk." Tr. 659. It therefore appears that this is not a disputed fact in this litigation. Accordingly, there is no reason for the court to draw any adverse inference since it is acknowledged by the government that plaintiff was not on "fall risk" at the time of the accident.

#### 2. *Missing Witnesses*

■ The plaintiff also argues that the court should draw an adverse inference from the fact that "not one witness who treated the patient was called by the government." Tr. 646. Generally, "there is no duty on the part of either party to call any particular person as a witness. However, if a witness could have given material non-cumulative evidence, an unfavorable inference can be drawn." *Repecki v. Home Depot,* 942 F.Supp. 126, 129 (E.D.N.Y.1996). An adverse inference would arise only if plaintiff could prove that defendant had it "peculiarly within their power to produce" that witness. *Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F.2d 966, 973 (2d Cir.1985); *but see Kupfer v. Dalton,* 169 A.D.2d 819, 820, 565 N.Y.S.2d 188, 189 (2d Dep't 1991) (the burden is on the party opposing the inference to show that the witness is not under his or her control). Moreover, whether a witness is under the control of one party or "[w]hether a witness is equally available depends not solely on physical availability or accessability, but on all the facts and circumstances bearing on the relationship of the witnesses to the parties." *Sagendorf–Teal v. County of Rensselaer,* 100 F.3d 270, 275 (2d Cir.1996).

■ The government contends that plaintiff is requesting this inference based on the government's failure to call two treating nurses and a treating doctor. Plaintiff, however, did not identify the missing witnesses during summation. Tr. 647. The government claims that the witnesses were equally available to the plaintiff arguing that plaintiff not only deposed the witnesses during the discovery phase of the trial, but that she could have subpoenaed the witnesses for trial or sought to enter into evidence any part of the depositions. Accordingly, I find that these witnesses were equally available to the plaintiff and decline to consider their absence adversely.

#### 3. *The Broken Hip*

■ The court credits the incident report which shows that Mr. LaMarca's bed rails were down before he fell. Tr. 119; *Plaintiff's Exhibit 4.* The plaintiff provided expert medical testimony that Mr. LaMarca should have been designated a fall risk which the court also credits. Plaintiff was admitted with complaints of dizziness and shortness of breath, and was on a number of diuretic medications as well as sedative and hypotensive drugs. The combination of these factors

made it reasonably foreseeable that he would be unsteady on his feet and prone to a fall if he got out of bed. Accordingly, I find that defendant is liable for Mr. LaMarca's hip fracture.

### 4. *Malnutrition*

■ Plaintiff proved that the Hospital breached its duty to Mr. LaMarca by not ensuring he was properly nourished. Plaintiff also provided expert medical testimony that decedent's malnourishment contributed to the general decline of his health by hampering healing of his hip which exacerbated his already weakened state of health. Because it is reasonably foreseeable that an already ill patient who is not provided proper nutrition will suffer a decline in health as well as a diminished capacity to heal, I find the Hospital is also liable for Mr. LaMarca's malnutrition.

### 5. *The Bedsores*

■ Plaintiff also produced evidence, which the court credits, in the form of expert medical opinion that the Hospital was negligent in caring for Mr. LaMarca's skin. Bedsores are a common occurrence with bedridden patients and reasonable preventative efforts should be taken to avoid their occurrence. There was ample evidence that the Hospital failed to prevent Mr. LaMarca's bedsores. Moreover, once they developed, the Hospital failed to adhere to a treatment plan that provided adequate care to prevent the sores from worsening and multiplying, which they did. There can be no doubt that bedsores are a reasonably foreseeable consequence of inadequate skin treatment. Accordingly, I find that the Hospital is also liable for Mr. LaMarca's bedsores.

### 6. *Proximate Cause of Death*

It has been stated that "[a]lmost every person who receives the services of a physician is sick or disabled when he first goes to the physician. There lurks the ever present possibility that it was the patient's original affliction rather than the physicians's negligence which caused the ultimate damage." *Sitts v. United States,* 811 F.2d 736, 740 (2d Cir.1987) (citing *Monahan,* 82 A.D.2d at 107, 442 N.Y.S.2d at 298)).

■ Plaintiff's expert witness, Dr. Hart, testified that because Mr. LaMarca, who suffered from congestive heart failure, was bedridden as a result of his hip fracture, he was unable to ambulate which made it impossible for him to effectively get the fluid out of his lungs. He also developed blood clots in his veins as a result of his inactivity. Furthermore, the fact that he was malnourished exacerbated his already weakened condition. Defendant's expert, Dr. Tice, testified that Mr. LaMarca was in the end stages of congestive heart failure and would have died even if he hadn't fractured his hip. In support of this opinion, Dr. Tice stated that Mr. LaMarca started to show some signs of improvement with respect to his congestive heart failure in the two to three weeks immediately following the fracture. Tr. 490. Dr. Tice further stated that Mr. LaMarca's health continued to improve into the month of June when it started to deteriorate resulting in his death in August. Id.

Mr. LaMarca had a long history of admissions relating to his congestive heart failure. In almost every case, he was stabilized in emergency or telemetry, admitted for about two weeks, in which time he would show signs of improvement, and was then released and returned home. The evidence presented by Dr. Tice only serves to bolster plaintiff's contention that if Mr. LaMarca had not been bedridden as a result of the hip fracture, he probably would have been sent home after two weeks. Defendant's assertion that Mr. LaMarca was in the end stages of cardiac disease is contradicted by its own expert who testified that his health initially improved in spite of the hip fracture. The fact that Mr. LaMarca's health didn't begin to irreversibly decline until he had been bedridden for several months is further proof that the fracture directly contributed to his death by preventing him from doing his pulmonary toilet. Moreover, defendant's negligence with respect to Mr. LaMarca's nutrition further contributed to his declining health, ultimately resulting in his death. Accordingly, I find that defendant is liable for Mr. LaMarca's death.

## V. DAMAGES

### A. Wrongful Death Action

The New York wrongful death statute provides as follows:

The personal representative ... of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued.

NY EPTL § 5–4.1. In accordance with section 5–4.3, the damages recoverable in a wrongful death action must be "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought" including lost wages, "reasonable funeral expenses" and "interest upon the principal sum recovered by the plaintiff from the date of the decedent's death." NY EPTL. § 5–4.3. This includes recovery for "loss of support and assistance," but not for the "grief or loss of society or companionship." *Sand v. Chapin*, 238 A.D.2d 862, 864, 656 N.Y.S.2d 700, 701–02 (3d Dep't 1997). Pecuniary injury may be claimed by adult children for loss of "parental guidance and advice as well as nurture and care." *Kiker v. Nassau County*, 175 A.D.2d 99, 101, 571 N.Y.S.2d 804, 806 (2d Dep't 1991) (citations omitted).

#### 1. Funeral Expenses

Mrs. LaMarca spent $5,284 on her husband's funeral. Funeral expenses are recoverable under the New York wrongful death statute. The court awards this amount to plaintiff.

#### 2. Other Pecuniary Loss

The decedent collected $845 per month from social security. Plaintiff testified that a portion of this money went to pay utilities and other unidentified expenses, and a portion paid expenses for her husband. Tr. 83. She further testified that, after her husband's death, the benefits stopped and she was unable, on her income alone, to pay the bills she was left with. For this reason she took out a home equity loan to consolidate the credit card debt that she and her husband had incurred. Since plaintiff is entitled to recover only the amount of her pecuniary loss, she is not entitled to claim as damages any portion of the $845 per month attributable to Mr. LaMarca's upkeep or expense. *See McKee v. Colt Electronics Co., Inc.*, 849 F.2d 46, 49 (2d Cir.1988) (past personal expenditures may be considered when estimating what decedent would have spent on his survivors over the remainder of his natural life). Such damages are often, as here, not capable of exact proof. *See Parilis v. Feinstein*, 49 N.Y.2d 984, 985, 406 N.E.2d 1059, 1060, 429 N.Y.S.2d 165, 166 (1980) ("the absence of dollar and cents proof of pecuniary loss does not relegate the distributees to recovery of nominal damages only"). The trier of the facts is "permitted to consider, in a reasonable way, those prospective and indefinite damages arising from the death of [the decedent]." *Countryman v. Fonda, J & G.R. Co.*, 166 N.Y. 201, 209–10, 59 N.E. 822, 824 (1901).

The customary rule in wrongful death is that "evidence of a decedent's gross income at the time of death is the standard to measure the value of income already lost and to measure the loss of future earnings." *Johnson v. Manhattan–Bronx Surface Transit Operating Authority*, 71 N.Y.2d 198, 204, 519 N.E.2d 326, 328, 524 N.Y.S.2d 415, 418 (1988). Accordingly, the court will consider that Mr. LaMarca, due to his poor health, had a life expectancy of three years, and that approximately one half of his lost income constitutes economic loss to the plaintiff. Accordingly, the court awards the plaintiff the sum of $15,210 as her loss of income due to the cessation of her husband's social security payments.

Pecuniary loss does not include mental anguish or loss of companionship. *See Liff v. Schildkrout*, 49 N.Y.2d 622, 633, 404 N.E.2d 1288, 1291, 427 N.Y.S.2d 746, 749 (1980) (loss of consortium is not actionable under the wrongful death statute). It does include, however, household duties performed for the surviving spouse as well as guidance and advice to the adult children. *See Korman v. Public Service Truck Renting, Inc.*, 116 A.D.2d 631, 632, 497 N.Y.S.2d

480, 481 (2d Dep't 1986) (evidence of decedent's performance of household duties, and providing of love, guidance and advice is sufficient proof of pecuniary loss under the wrongful death statute); *Pullman v. Pullman*, 216 A.D.2d 886, 887, 629 N.Y.S.2d 577, 578 (4th Dep't 1995) (evidence that decedent cooked, cleaned and ironed for her adult children and babysat grandchildren was evidence of pecuniary loss). Because of Mr. LaMarca's weakened condition due to ill health immediately prior to his last hospitalization, I find that there can be no award for such services to the plaintiff or any of the adult children.

### 3. *Mitigation of Damages*

 The government further contends, with respect to the social security benefits, that plaintiff is under a duty to mitigate damages and was entitled to make application to continue these benefits after her husband's death. At trial, the plaintiff testified that during the period of her husband's final hospitalization, she was employed as a bookkeeper for Martin Long Cesspool Company. Tr. 81. She further testified that she was aware that the survivor could apply for continued benefits and that she chose not to apply for social security in her husband's name after his death. Tr. 84, 97.

 Under New York law, the plaintiff has the duty to mitigate damages. *See Salas v. United States*, 974 F.Supp. 202, 211 (W.D.N.Y.1997) ("[u]nder New York law, an injured party has a duty to mitigate her damages"); *Golbar Properties, Inc. v. North American Mtge. Investors*, 78 A.D.2d 504, 505, 431 N.Y.S.2d 820, 822 (1st Dep't 1980) ("Even though a plaintiff should be made whole, he must act to avoid excessive damages.") Notwithstanding this, "the burden of proof is not upon the plaintiff to prove that he acted to mitigate damages, but rather upon the party who asserts the failure to mitigate." *Id. See also, Oneonta Dress Co. v. Ozona–USA, Inc.*, 120 A.D.2d 899, 901, 503 N.Y.S.2d 167, 169 (3d Dep't 1986) ("although plaintiff has a duty to mitigate damages, defendant has the burden of showing that damages could have been prevented") Here, defendant submitted no evidence that plaintiff was qualified under 20 C.F.R. § 404.335 and would have received benefits had she applied. 20 C.F.R. § 404.335 provides in pertinent part:

> You may be entitled to benefits as the widow or widower of a person who was fully insured when he or she died. You are entitled to these benefits if—
>
> (a) You are the insured's widow or widower based upon a relationship described in §§ 404.345–404.346, and one of the following conditions is met:
>
>> (1) Your relationship to the insured as a wife or husband lasted for at least 9 months immediately before the insured died.
>
> \* \* \* \* \* \*
>
> (b) You apply, . . .
>
> \* \* \* \* \* \*
>
> (c) You are at least 60 years old; or you are at least 50 years old and have a disability as defined in § 404.1505 . . .
>
> \* \* \* \* \* \*
>
> (d) You are not entitled to an old-age benefit that is equal to or larger than the insured person's primary insurance amount; and
>
> (e) You are unmarried, . . .
>
> \* \* \* \* \* \*

The government conclusorily and simply asserts that "Mrs. LaMarca may have been entitled to receive her husband's benefits," relying exclusively on 20 C.F.R. § 404.335. Thus, while the government has established that plaintiff was aware that she could apply for benefits and that she chose not to do so, there have been no facts established from which the court could reasonably conclude that she was entitled to receive such benefits.

The court is unable to conclude from the evidence introduced that plaintiff was entitled to receive any survivor benefits as the government maintains. The government's claim that she "may" have been entitled to her husband's benefits is insufficient. It "may" well be that she chose not to apply to preserve her entitlement to greater benefits under her own name. *See* 20 C.F.R. § 404.335(d), *supra*. The government addi-

tionally offers no evidence to show the amount of any such benefits. For the foregoing reasons the court will not reduce the pecuniary loss award, as requested by the government, based on any failure to mitigate.

### 4. Collateral Source

CPLR 4545(c) provides in pertinent part: In any action brought to recover damages for ... wrongful death, where plaintiff seeks to recover for ... loss of earnings, ... evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified in whole or in part from any collateral source such as ... social security.

"The burden is on the defendant to prove that a plaintiff's award should be reduced by payments received from collateral sources." *Damiano v. Exide Corp.*, 970 F.Supp. 222, 229 (S.D.N.Y.1997) (citations omitted); *Shue v. Red Creek Cent. Sch. Dist.*, 177 Misc.2d 743, 676 N.Y.S.2d 742, 744 (Sup. Ct.1998) ("defendants have the burden of proof by a preponderance of the evidence on the issue of collateral source reductions").

As discussed above, the defendant failed to prove that Mrs. LaMarca was entitled to any benefits from the Social Security Administration for the loss of her husband's social security benefits for the three years after his death. Defendant has submitted no evidence upon which to base the requested set-off. Moreover, the uncertainty of plaintiff's entitlement to widow's benefits under 20 C.F.R. § 404.335, on this record, does not rise to the level of a "reasonable certainty," as required under CPLR 4545(c). For the foregoing reasons, the court denies the government's request to offset pursuant to CPLR 4545(c) the amount of any widow's benefit under 20 C.F.R. § 404.335.

### B. Medical Malpractice Action—Conscious Pain and Suffering

"There is no mathematical formula or slide rule for computing damages for pain and suffering with precision, ... lawyers, judges, and jurors can do no more than make an intelligent guess as to the extent of pain and losses consequent upon personal injury." *Cruz v. United States*, No. 94 CIV 6545, 1998 WL 13839, *10 (S.D.N.Y. Jan 15, 1998) (citing *Lucivero v. Long Island Railroad*, 22 Misc.2d 674, 200 N.Y.S.2d 728 (1960); *Cole v. Long Island Lighting Co.*, 24 Misc.2d 221, 196 N.Y.S.2d 187 (1959)).

Testimony indicates that although Mr. LaMarca was given pain and sedative medication throughout his hospitalization, he suffered considerable pain in connection with his broken hip, and the complications that flowed from it, until the day he died. Evidence indicates that he was not properly fed and also suffered from bedsores that multiplied and worsened in intensity during his hospitalization. In addition, as his condition deteriorated, Mr. LaMarca became incontinent and was separated from his home and family for almost four months as opposed to two to three weeks of hospitalization on his prior stays. I find that plaintiff is entitled to the sum of $375,000 for decedent's past pain and suffering. *See Kogan v. Dreifuss*, 174 A.D.2d 607, 608, 571 N.Y.S.2d 314, 315 (2d Dep't 1991) ($350,000 for pain and suffering for 50 hours of extreme illness with high fever resulting in death); *Arbutina v. Bahuleyan*, 159 A.D.2d 973, 973–74, 552 N.Y.S.2d 766, 767 (App.Div.1990) ($265,000 recovery for pain and suffering reasonable to compensate patient for 47 days of excruciating pain ending in death); *Vialva v. City of New York*, 118 A.D.2d 701, 499 N.Y.S.2d 977, 978 (2d Dep't 1986) ($100,000 for pain and suffering for almost 14 hours of induced labor resulting in death); *Spadaccini v. Dolan*, 63 A.D.2d 110, 123, 407 N.Y.S.2d 840, 847–848 (1st Dep't 1978) ($25,000 recovery for pain and suffering awarded and not reduced when decedent lingered for 21 days in spite of evidence that he was unconscious at least part of that time).

### C. Loss of Consortium

Although loss of consortium is not cognizable under the wrongful death statute, a claim for loss of consortium is cognizable as a separate action in a wrongful death suit "during the period of decedent's conscious pain and suffering." *Liff*, 49 N.Y.2d at 634, 404 N.E.2d at 1291, 427 N.Y.S.2d at 750. Mrs. LaMarca is entitled to claim loss of consortium for the period of her husband's

fall from the bed up to the date of death—April 12 through August 4, 1994. *See Chang v. New York City Health and Hospitals Corp.,* 82 A.D.2d 764, 764–65, 440 N.Y.S.2d 211, 212 (1st Dep't 1981) (award for loss of consortium from date of accident to date of death is appropriate). Based on the evidence adduced and considering the plaintiff's arthritis and overall poor condition of health prior to the last hospital admission, I find that the plaintiff spouse is entitled to an award in the sum of $5,000 due to loss of consortium.

## VI. *CONCLUSION*

For the reasons stated above, the Clerk of the Court shall enter judgment in favor of the plaintiff Barbara LaMarca and against the defendant United States of America in the amount of $400,494, with interest on the wrongful death award of $20,494 from August 4, 1994, the date of death.

SO ORDERED.

## *ORDER*

By letter motion, dated December 24, 1998, the government moves, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, to amend the final judgment, dated December 16, 1998, to delete the award of prejudgment interest. The government's application is granted, without opposition. The Federal Tort Claims Act, under which this action is brought, provides, in relevant part, that the United States "shall not be liable for interest prior to judgment. . .". 28 U.S.C. § 2674. *See Barrett v. United States,* 1991 WL 60365 *2 (S.D.N.Y.).

The Clerk is directed to amend the judgment to delete the award of prejudgment interest in the sum of $8,054.98 and to reflect a total judgment in the sum of $400,494.00. The Memorandum Opinion and Order of the undersigned, dated December 9, 1998, is deemed modified to conform with this order.

SO ORDERED.